**SHELTON, Appellant and Cross–Appellee,**

**v.**

**GREATER CLEVELAND REGIONAL TRANSIT AUTHORITY et al., Appellee and Cross–Appellant.**

[Cite as *Shelton v. Greater Cleveland Reg. Transit Auth.* (1989), 65 Ohio App.3d 665.]

Court of Appeals of Ohio,
Cuyahoga County.

Nos. 56287, 56431.

Decided Dec. 18, 1989.

*Nicholas M. DeVito & Assoc.* and *Nicholas M. DeVito,* for appellant and cross-appellee.

*Russell T. Adrine* and *Robert E. Davis; Gold, Rotatori, Schwartz & Gibbons Co., L.P.A., Niki Z. Schwartz, Orville E. Stifel II* and *Kent R. Markus,* for appellee and cross-appellant. .

JOHN F. CORRIGAN, Judge.

In this consolidated appeal, the defendant Greater Cleveland Regional Transit Authority seeks reversal of a jury trial judgment for the plaintiff on her negligence claim stemming from her rape at a transit authority rapid station (case No. 56431). The plaintiff appeals from the trial court's denial of her motion for prejudgment interest on the $750,000 jury award (case No. 56287).

The transit authority, in five assignments of error, claims that the trial court erred in (1) denying its motions for a directed verdict and for judgment notwithstanding the verdict, (2) admitting the testimony of a former transit authority board member who criticized management policies and admitting testimony relating to the rape of another woman by the plaintiff's attacker on the previous day, (3) admitting the testimony of an expert witness where the plaintiff failed to file an expert witness report pursuant to local rule, (4) finding R.C. 2744.05(C), which limits damage awards against political subdivisions to $250,000, unconstitutional, and (5) denying the transit authority's motion for remittitur.

The plaintiff, in her two assignments of error, argues that the trial court abused its discretion in denying her motion for prejudgment interest and erroneously excluded evidence in support of that motion, which concerned the transit authority's failure to cooperate in discovery. We find that the trial court erred in denying the transit authority's directed verdict motion, so we reverse the trial court's judgment and order judgment for the transit authority.

## I

The plaintiff bases her negligence claim essentially upon the transit authority's failure to adequately provide for system security, adequately light the transit authority parking lot where the rape occurred, and to increase security at the rapid station in response to the rape of a transit authority passenger the previous day.

The thirty-four-year-old plaintiff testified that at approximately 6:00 on January 15, 1985, she left the rapid train at her local station in the city of East Cleveland on her way home from work. She walked to her car, which she had parked in the transit authority lot earlier that day "a few" parking spaces away from the entrance to the rapid station. When she reached her car, she heard someone approach her from behind. She turned and saw a young man who pointed a gun at her and said, "If you scream, I will blow your brains out." The youth ordered her into her car and raped her three times. Afterward, he drove her through the neighborhood for a short time until the plaintiff was able to flee when at one point her attacker stopped the car. She ran to a nearby store located within Cleveland city limits in order to obtain assistance. There, Cleveland police responding to her call, met and interviewed her. Later that evening, the police arrested the suspect and the plaintiff identified him as her assailant. The police took the plaintiff to a local hospital where she was examined and treated.

One month later authorities advised her that the suspect had a venereal disease. She underwent preventative treatment at that time. The plaintiff stated that this information caused her additional anguish.

The plaintiff described the lighting at the parking lot where the attack occurred as being "not bright." On cross-examination, however, she stated that the lighting was "adequate." The plaintiff said that the rapid station had been constructed so that the fare attendant could not see the parking lot from his booth.

The plaintiff testified that a transit authority police officer interviewed her at the hospital before her release. Upon telling the officer that she had been raped at the rapid station parking lot, the officer, referring to a rape of a passenger the previous evening, exclaimed in surprise, "[T]his happened last night." The plaintiff's father corroborated this testimony.

The plaintiff said that she was too upset to live at her home alone with her two children in the month following the rape. During that period, she lived with her mother for a period and thereafter with her sister. She claims that she has "flashbacks" of the attack and hyperventilates whenever she goes near a rapid station.

The plaintiff claimed that the rape severely disrupted her personal life. Because of the rape, the seven-year relationship she had with her former boyfriend ended. She distrusts men and has been unable to maintain any relationship with a man since the rape. She has periods where she cannot sleep and occasionally her sleep is disturbed by nightmares of the attack. She becomes irrationally upset with and unreasonably protective of her two teenage children. She becomes enraged and cries for no apparent reason. She refuses to go out of her home at night. The plaintiff testified that none of these behaviors existed prior to the rape.

The plaintiff further testified in regard to the economic losses she sustained as a result of the rape. She currently works as a word processor at a local board of education. She has been employed there for three years. At the time of the rape, she had just started a temporary job as a word processor at a local office. She stated that she lost no time from that job as a result of the rape. She went back to work the morning following the attack. However, the plaintiff testified that at the time of the rape she had just completed the first year of a three-year evening court reporter program. She stated that she fully intended to complete that program and become a professional court reporter, but discontinued that program after the rape. The witness claimed that as a court reporter her income would have been "substantially increased."

The plaintiff testified that since the attack three mental health professionals have treated her. She sees her current psychologist on an irregular basis when she feels a need to discuss her problems. The plaintiff stated that she has declined to participate in group therapy as her psychologist has advised. She testified that her bills for psychological treatment amount to $490 and that she also paid $137.50 for her treatment at the hospital emergency room.

The two Cleveland police detectives who first responded to the plaintiff's call for help testified. They stated that they found the plaintiff in a severely distraught condition. After receiving a description of the suspect from the plaintiff, they toured the area and shortly thereafter apprehended him. The plaintiff identified him as her attacker.

One of the detectives claimed that at a later time he discussed the case with the East Cleveland detective in charge of the investigation. The detective told him that because of a rape the previous evening, the East Cleveland Police Department had stationed officers at the rapid station to look for the rapist. The detective told him that the East Cleveland police could not understand how they missed apprehending the rapist on the night that he attacked the plaintiff.

The victim of the previous night's incident testified that she was leaving the rapid station when her attacker walked up behind her, stuck a gun in her back, and walked her down the street away from the station where he forced her to engage in sexual acts with him. She escaped and reported the attack to the East Cleveland Police Department.

The plaintiff's mother, father, sister, seventeen-year-old son, fourteen-year-old daughter, former boyfriend, and co-worker all testified with respect to the effect the rape has had on the plaintiff's personality. In substance, their testimony discloses that since the rape the plaintiff has become reclusive, prone to emotional outbursts, prone to bouts with severe depression, and overly protective of her children. Deep anxieties concerning men have inhibited both her work and social relationships. She has developed phobias concerning public transportation and travelling during the night.

The plaintiff's family doctor testified that he examined the plaintiff three weeks after the rape. He described her as being "anxious" and "very upset." He described the albeit necessary procedures performed on rape victims in emergency rooms as being "degrading." The doctor administered medication to her to treat potential venereal disease. In discussing this treatment with the plaintiff, he observed that she was anxious about contracting the disease from her attacker. The doctor testified that he charged the plaintiff $35 for the treatment.

The plaintiff called as an expert witness a psychologist who specializes in post-traumatic stress syndrome. The witness testified that he examined the plaintiff in 1987 and 1988 and found that she exhibited the traditional symptoms of post-traumatic stress disorder as a result of the rape. He stated that during his sessions with the plaintiff she would occasionally lapse into trance-like states. She continued to feel terror and anger in connection with the rape and experienced flashbacks of the actual attack. The plaintiff informed him that she had difficulty sleeping since she feared another attack by the rapist. She would consistently awake from her sleep and experience panic attacks.

The plaintiff lacks concentration at work because she is "obsessed with the trauma of the rape." Because of the experience she does not trust anyone, particularly men. The witness opined that because of the experience it would be nearly impossible for her to establish a normal relationship with a man. The witness stated that the plaintiff feels unsafe when travelling from her home, which inhibits her ability to obtain the treatment that she requires. The doctor diagnosed the plaintiff as suffering from chronic post-traumatic stress syndrome of a permanent nature caused by the rape. He concluded

that the plaintiff lives with "[a]stronomical pain" which will exist at some level for the rest of her life.

The plaintiff called as if on cross-examination the transit authority's former general manager, the original transit authority security chief, and the current chief of transit security. Both security directors also testified on behalf of the transit authority.

The former general manager of the transit authority testified that he was manager of operations at the time of the attack on the plaintiff. He stated that the transit authority's policy was to protect its passengers "as much as possible" and to also protect transit authority property. The witness conjectured that in 1985 the transit authority allocated approximately $2,200,000 of its $125,000,000 budget to security. He recalled that in 1982 or 1983 he instructed the chief of security to increase the patrols at the rapid stations and to assign available security personnel to as many stations as possible. The witness testified that at that time the transit authority, in response to citizen complaints, assigned officers to a beat patrol at a rapid station where many crimes had been reported. The transit authority also installed a surveillance camera at that station using federal monies. In January 1985, the transit authority held public hearings to address citizen complaints concerning transit authority security.

The original chief of transit security testified that he held his position from 1976 to 1983. He testified that the state legislature created the transit police in 1977 with the purpose of protecting transit authority passengers, employees, and property. The transit police's jurisdiction included bus routes, rapid lines, the rapid stations, and the rapid station parking lots. The witness stated that the number of officers employed by the transit authority fluctuated from a high of thirty-four to a low of twenty at the time when he retired in 1983.

The former chief testified with regard to the general mode of deployment of security personnel. He stated that the transit police operated three shifts. On a daily basis the transit police had six to eight officers to patrol on each shift. On rare occasions, no officers were available for patrol duties. The department generally assigned a single patrol car manned by one or two officers to each of the transit authority's three patrol zones. Occasionally, only two cars were assigned to patrol the three zones. The patrols were expected to inspect the rapid stations in their zones twice during each shift. Additional officers, when available, were assigned to ride the rapid and bus lines and to patrol the rapid stations and parking lots. Each patrol car was equipped with a two-way radio and each officer on foot patrol carried a walkie-

talkie. A central transit authority police dispatcher monitored the entire network.

The witness testified that the transit authority police maintained a working relationship with the municipal police departments within the system. Municipal police commonly responded to complaints of offenses occurring on transit authority property. Generally, the local police forwarded to the transit police copies of reports of arrests made on transit authority property. The chief admitted that manpower was a problem for the transit authority police.

The current chief of transit police testified that, in his opinion, the transit authority needs fifty-seven patrolmen in order to effectively police the system. Currently, the system includes fifty-one full time officers and eighty part-time officers hired from local municipal police departments. He stated that the rapid station where the attack occurred was not a high crime area. He further testified that that station's parking lot has adequate lighting.

The plaintiff called as an expert witness a former transit authority board member. The witness began working for the transit authority in 1979 as an administrative consultant rendering advice concerning employee productivity. In 1983, the witness became director of administrative services in charge of data processing and procurements. In 1986, the transit authority fired her from that position. County commissioners appointed her to the transit authority's board of trustees later that year where she served for one and one-half years.

The witness testified that the rapid station where the plaintiff was raped was a high crime area. She stated that until 1984, system security was a high priority with transit system management. She testified that at that time the combination of round-the-clock patrols and that installation of a surveillance camera solved the crime problem at one rapid station.

The witness testified that in 1984 and 1985, the transit authority consistently received complaints from the public concerning inadequate lighting and infrequent security patrols at rapid station parking lots. She testified that in 1984 and 1985, approximately nineteen security personnel patrolled the four hundred ninety-four square miles of the transit authority service area. She claimed that generally only two patrol cars were available to patrol the entire system. She described the transit authority security policy in 1984 and 1985 as being "[w]ilfully inadequate." She testified that she resigned from the transit authority board of trustees due to management's corruption and incompetence.

The plaintiff further called as a witness a former transit authority police officer who served from 1977 to 1983. He testified that generally six to seven officers patrolled during each shift. Generally, three patrol cars were as-

signed to patrol although occasionally no automobiles were available for patrol due to maintenance problems. He described the lighting at the lot where the attack occurred as being "[v]ery poor" and described the station as being a high crime area.

The witness testified that his superiors expected the zone cars to patrol each of the rapid stations at least once during each shift. However, he claimed that often rapid stations would go unpatrolled during a shift because the patrols were occupied responding to various complaints. The witness stated that he left the transit authority police in 1983 due to his frustration with the department's lack of equipment and personnel. He opined that the system required one hundred fifty officers supplemented by surveillance cameras in order to provide adequate security.

Two East Cleveland police officers testified in regard to the recorded criminal activity at the rapid station where the plaintiff was raped. Testifying from police records and their own experience with the station, they stated that numerous violent crimes were committed at the rapid station from 1975 to 1985.

One of the officers testified that the plaintiff's attacker admitted raping another woman under similar circumstances the night before. The actual rape of that victim occurred at a nearby fast food restaurant. He further stated that East Cleveland police regularly patrol that rapid station. The officer described that station as being well lit but described the adjoining parking lot as being poorly lit. He stated that the rapid station was a high crime area.

The plaintiff called as an expert witness a veteran Cleveland police sergeant. The witness testified that he personally inspected the rapid station where the attack on the plaintiff occurred and further inspected the transit authority and East Cleveland criminal records. He stated that the rapid station is a high crime area. He described the lighting at the rapid station as being poor for the purposes of security.

The transit authority called as a witness the maintenance supervisor for its rapid stations. He stated that he was familiar with the lighting at the rapid station parking lot at the time of the rape of the plaintiff. He testified that the lighting in 1985 was substantially the same as the current lighting. The witness stated that thousand-watt flood lights illuminated the parking lot from poles on the street bordering the parking lot. He claimed that these lights adequately illuminated the parking lot.

The transit authority called as a witness the former East Cleveland detective who investigated the attack on the plaintiff. He testified that the East Cleveland police regularly patrolled the rapid station and responded to com-

plaints of criminal activity at the station. The former detective testified that his department did not regularly report arrests made and complaints received concerning the rapid station to transit authorities.

The transit authority also called as a witness a former transit authority police officer who served on the force from 1983 to 1985. The officer testified that he generally patrolled the zone which included the rapid station where the rape occurred. He stated that department policy required zone car patrols to be within fifteen minutes' response time to the rapid stations within the patrol zone. The witness testified that by mutual agreement the municipal police departments generally responded first to criminal complaints at the rapid stations.

The officer recalled that he was on patrol in a zone car at the time of the rape. He stated that the department assigned one other officer to a foot patrol of the rapid line in his zone that day. The officer testified that he went to the hospital where the plaintiff had been admitted upon receiving a radio report of the rape at the rapid station. There he met an East Cleveland police officer who was handling the investigation. He left the hospital after the two agreed that the East Cleveland Police Department would be responsible for the investigation. The witness denied having any knowledge of a rape occurring the previous evening. The witness who currently works as an East Cleveland police officer testified that there is no protocol between the transit police and the municipal police calling for the exchange of reports of crime committed at the rapid station.

The transit authority also called as a witness a transit police sergeant employed by the system since 1977. She testified that originally the transit police force consisted of twelve officers. The force in 1985 consisted of approximately twenty-six officers. The officer stated that the lighting at the rapid station where the rape occurred brightly illuminated the parking lot.

At the conclusion of the plaintiff's evidence and at the close of all the evidence, the transit authority moved for a directed verdict. The trial court denied these motions. The jury found for the plaintiff on her claim and awarded $750,000.

The trial court denied the transit authority's motions to limit damages pursuant to R.C. 2744.05(C) and for remittitur. In denying both motions, the trial court specifically found the statute's damage limitation unconstitutional. The trial court further overruled the transit authority's motion for judgment notwithstanding the verdict and the plaintiff's motion for prejudgment interest pursuant to R.C. 1343.03(C).

## II

The transit authority first argues that the trial court erred in overruling its motions for a directed verdict and for judgment notwithstanding the verdict.

The standard to be applied by a trial court in determining a motion for a directed verdict is the same standard to be applied in ruling on a motion for judgment notwithstanding the verdict. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 411, 504 N.E.2d 19, 21. The trial court must grant these motions where the evidence adduced at trial, construed most strongly in favor of the non-moving party, discloses that reasonable minds could come to but one conclusion on a determinative issue and that conclusion is adverse to the party opposing the motion. *Id.;* cf. Civ.R. 50. The trial court, in making this determination, considers neither the weight of the evidence nor the credibility of the witnesses. *Osler v. Lorain, supra,* at 347, 28 OBR at 411, 504 N.E.2d at 21.

In this case, construing the evidence most strongly in favor of the plaintiff, we find that the plaintiff failed to set forth any evidence which would support a claim for relief against the transit authority.

The Supreme Court of Ohio has recently ruled that a municipal corporation may not be found liable in negligence for its police department's failure to protect an individual from criminal activity absent a showing that the municipality owed a special duty of care to that individual. See *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 525 N.E.2d 468. This common-law standard applies to those actions, including this action, which accrued prior to November 20, 1985, the effective date of the current law which defines political subdivision liability. *Id.* at 225, 525 N.E.2d at 473; see, generally, R.C. 2744.01 and 2744.02.

The court recognized the continued vitality of the "public duty rule" which immunizes government bodies from negligence liability for the failure to discharge a legally imposed duty owed to the general public. *Id.* at paragraph two of the syllabus. Implicit in this rule is the notion that no governmental entity can be held liable for making fundamental policy decisions which are characterized by a high degree of administrative judgment and discretion. *Id.* at 225–226, 525 N.E.2d at 473.

The court stated the one exception to the rule. A municipal corporation may be held liable where a "special duty" existed between the municipality and the injured party.

"In order to demonstrate a special duty or relationship, the following elements must be shown to exist: (1) an assumption by the municipality,

through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." *Id.* at paragraph four of the syllabus.

We perceive no valid reason why the public duty rule and its exception as stated in *Sawicki v. Ottawa Hills, supra,* should be limited in their application to municipal corporations to the exclusion of regional transit authorities. Pursuant to R.C. 306.31, the transit authority is defined "as a political subdivision of the state and a body corporate with all the power of a corporation * * *." The Revised Code authorizes the maintenance of security operations "necessary for the protection of persons and property under [the transit authority's] jurisdiction and control." R.C. 306.35(Y). Accordingly, a transit authority's duty to provide security within its jurisdiction differs in no significant respect from the general public duty a municipality has in providing security within municipal boundaries.

■ In concluding that the public duty rule applies in this case, we further determine that the special duty exception to the rule does not apply. Clearly, there is no evidence that the transit authority assumed through promises or actions an affirmative duty to protect the plaintiff in her individual capacity. There is no evidence that the plaintiff and the transit authority had any direct contact from which an expression of a security commitment could have been communicated. Further, there is no evidence that the plaintiff justifiably relied upon an affirmative promise of security by the transit authority. See *Sawicki v. Ottawa Hills, supra,* at paragraph four of the syllabus.

■ The plaintiff premises her claim of negligence upon the transit authority's failure to allocate additional economic resources in order to (1) increase the size of its police force, (2) equip rapid stations with surveillance cameras, and (3) improve the lighting at rapid station parking lots. She further faults the transit authority for its failure to deploy its limited security resources to prevent the repetition of one crime when her evidence is that the entire transit system is burdened with criminal activity.

However, to permit liability on this basis would invite an assault upon the public coffers. Every governmental body faces budgetary restrictions and few can afford to fund "ideal" security operations. Liability cannot be predicated upon legislative and administrative allocations of scarce resources to security needs. Assuming *arguendo* that we would recognize liability on this basis, the plaintiff simply presented no evidence establishing the unreasonableness of the security budget in light of (1) other operational demands

upon the transit authority budget, or (2) funding for security among similarly situated transit systems.

The transit authority's first assignment of error has merit, so we reverse the trial court's judgment on this basis and order a final judgment for the transit authority on the plaintiff's claim. Pursuant to App.R. 12(A), we briefly address the remaining assignments of error submitted by both parties although our disposition of this assigned error effectively decides these appeals.

### III

■ The transit authority, in its second assigned error, argues that the trial court erred in permitting testimony concerning the prior rape and in permitting the former transit authority board member to testify that transit authority management operated in a corrupt and inefficient manner.

Generally, evidentiary rulings are matters within the sound discretion of the trial court. Cf. *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 223, 24 O.O.3d 322, 325, 436 N.E.2d 1008, 1012. Accordingly, we shall not overrule the trial court's evidentiary determinations absent a showing that the trial court acted unreasonably, unconscionably, or arbitrarily. Cf. *id.*

The transit authority first complains that the trial court erred in admitting evidence concerning the prior rape. Our review of the record discloses that the transit authority has waived its right to challenge portions of that testimony by failing to timely object at trial. See Evid.R. 103(A)(1). Further, the trial court severely restricted remaining testimony on this subject to the issue of whether the transit authority had in fact been notified that the rape had occurred. The trial court refused to admit the victim's hospital report and excluded testimony concerning the details of the attack which may have posed a danger of unfair prejudice. See Evid.R. 403(A). While we question whether notice has any relevance in this case, we recognize that the trial court has broad discretion in admitting marginally probative evidence on collateral issues. Cf. *Parma v. Manning* (1986), 33 Ohio App.3d 67, 69, 514 N.E.2d 749, 751. We conclude that this claim lacks merit.

■ The transit authority next complains that the trial court permitted the testimony of the former transit authority board member. Over the transit authority's objections the witness testified that the transit authority's security force was "willfully inadequate." She explained again, over objection, that she resigned from the transit authority board because of management's corruption and incompetence.

We find that the trial court committed reversible error in admitting this opinion testimony. The record shows that the plaintiff failed to elicit any testimony from the witness which would establish the witness as an expert in transit security. Thus, her testimony was inadmissible as expert testimony. See Evid.R. 702 (qualification of expert witness). The trial court could not properly admit her testimony as lay opinion testimony since it was not rationally based upon her perception. Evid.R. 701(1). Her opinions were wholly without foundation since she admitted at trial that she (1) never was directly involved in transit authority security operations, (2) was unfamiliar with transit authority records concerning criminal activity in the system, and (3) was unfamiliar with police manpower, deployment policies, or budget at the time of the rape.

These opinions substantially prejudiced the transit authority in light of their definitive, critical nature and the witness' former position with the transit authority.

This claim has merit.

## IV

The transit authority, in its third assignment of error, argues that the trial court erred in permitting the Cleveland police sergeant to give expert testimony. The transit authority argues that the witness failed to supplement his deposition responses with an expert witness report prior to trial pursuant to local rule. See Loc.R. 21(B) of the Court of Common Pleas of Cuyahoga County, General Division. The transit authority deposed the witness three days before the beginning of trial and claims that his testimony at trial substantially differed from his deposition testimony and resulted in "trial by ambush."

However, the transit authority failed to file the deposition testimony of the expert witness, so we are unable to determine whether substantial prejudice actually resulted. The party appealing from an adverse judgment bears the burden of providing an adequate record on appeal which demonstrates the claimed error and prejudice to the complaining party. *Bean v. Bean* (1983), 14 Ohio App.3d 358, 362, 14 OBR 462, 467, 471 N.E.2d 785, 791. Accordingly, we overrule this assigned error since the record on appeal fails to demonstrate prejudicial error in this regard.

## V

The transit authority, in its fourth assignment of error, argues that the trial court erred in finding that R.C. 2744.05(C) violates the retroactive law

prohibition of Section 28, Article II of the Ohio Constitution, and the Equal Protection Clauses of the Ohio and United States Constitutions. We agree.

R.C. 2744.05(C) provides for a limitation of damage award in personal injury actions against political subdivisions. The statute provides:

"(C)(1) There shall not be any limitation on compensatory damages that represent the actual loss of the person who is awarded the damages. However, except in wrongful death actions brought pursuant to Chapter 2125. of the Revised Code, damages that arise from the same cause of action, transaction or occurrence, or series of transactions or occurrences and that do not represent the actual loss of the person who is awarded the damages shall not exceed two hundred fifty thousand dollars in favor of any one person. The limitation on damages that do not represent the actual loss of the person who is awarded the damages provided in this division does not apply to court costs that are awarded to a plaintiff, or to interest on a judgment rendered in favor of a plaintiff, in an action against a political subdivision.

"(2) As used in this division, 'the actual loss of the person who is awarded the damages' includes all of the following:

"(a) All wages, salaries, or other compensation lost by the person injured as a result of the injury, including wages, salaries, or other compensation lost as of the date of a judgment and future expected lost earnings of such a person;

"(b) All expenditures of the person injured or another person on his behalf for medical care or treatment, for rehabilitation services, or for other care, treatment, services, products, or accommodations that were necessary because of the injury;

"(c) All expenditures to be incurred in the future, as determined by the court, by the person injured or another person on his behalf for medical care or treatment, for rehabilitation services, or for other care, treatment, services, products, or accommodations that will be necessary because of the injury;

"(d) All expenditures of a person whose property was injured or destroyed or of another person on his behalf in order to repair or replace the property that was injured or destroyed;

"(e) All expenditures of the person injured or whose property was injured or destroyed or of another person on his behalf in relation to the actual preparation or presentation of the person's claim;

"(f) Any other expenditures of the person injured or whose property was injured or destroyed or of another person on his behalf that the court determines represent an actual loss experienced because of the person or property injury or property loss.

" 'The actual loss of the person who is awarded the damages' does not include any fees paid or owed to an attorney for any service rendered in relation to a personal or property injury or property loss, and does not include any damages awarded for pain and suffering, for the loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education of the person injured, for mental anguish, or for any other intangible loss."

On April 30, 1983, the state legislature made the statute retroactive to actions accruing prior to November 20, 1985. See Sub. S.B. No. 297, Section 3.

The trial court, while finding the statute expressly applicable to the plaintiff's case, determined that the damages limitation unconstitutionally limited the plaintiff's right to recovery.

■ We first note the presumed constitutionality of legislation passed by the state legislature. *Hardy v. VerMeulen* (1987), 32 Ohio St.3d 45, 48, 512 N.E.2d 626, 629. Whether a statute violates Section 28, Article II of the Ohio Constitution's prohibition against retroactive laws requires the determination of whether the statute substantively impairs legal rights. *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph three of the syllabus. Remedial legislation may constitutionally be applied retroactively. Cf. *id.*

The ordinary meaning of the terms generally provide the basis for distinguishing between "remedial" and "substantive" legislation. *Id.* at 108, 522 N.E.2d at 497.

■ A statute is substantive if it (1) impairs or takes away vested rights, (2) affects accrued substantive rights, (3) imposes additional burdens or liabilities to past transactions, (4) creates new rights, or (5) creates or precludes the right to bring or defend legal actions. *Id.* at 107, 522 N.E.2d at 496. "Remedial laws are those affecting only the remedy provided. These include laws which merely substitute a new or more appropriate remedy for the enforcement of an existing right." *Id.* at 107, 522 N.E.2d at 497.

Applying these standards to R.C. 2744.05(C) requires the conclusion that the statute is remedial and is not an unconstitutional retroactive law. The statute places no limitation on the recovery of actual damages. The law ensures a substantial maximum amount for provable, intangible injuries rather than denies meaningful compensation for these losses by permitting only nominal awards. The statute forecloses no cause of action. The law makes no change in the basis for liability which either lessens or increases the plaintiff's chances of recovery. Compare *Van Fossen v. Babcock & Wilcox Co., supra,*

36 Ohio St.3d at 108–109, 522 N.E.2d at 498. Since the law is remedial in nature, it fully comports which the Ohio Constitution's restrictions on retroactive legislation.

◼ We further determine that R.C. 2744.05(C) satisfies equal protection guarantees. The threshold issue in equal protection analysis applicable to the instant action is whether the statute restricts a "fundamental right." Cf. *Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 373, 12 O.O.3d 327, 330, 390 N.E.2d 813, 818.

The trial court determined that R.C. 2744.05(C) infringes upon the fundamental right of an "open court" as set forth in Section 16, Article I of the Ohio Constitution:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay.

"Suits may be brought against the state, in such courts and in such manner as may be provided by law."

It is clear under the final clause of that section that the Ohio Constitution grants the state legislature the power to limit suits against government institutions. Accordingly, R.C. 2744.05(C) does not violate the Ohio Constitution's open court guarantees. Further, R.C. 2744.05(C) in no way forecloses a personal injury plaintiff from obtaining compensation from a liable political subdivision. Here, too, the law is remedial in nature rather than substantively restricting a fundamental right.

Since R.C. 2744.05(C) is constitutional, the trial court erred in failing to impose the legislated liability restrictions.

## VI

◼ The transit authority, in its final assignment of error, claims that the trial court erred in overruling its motion for remittitur. The transit authority argues that passion and prejudice influenced the jury's verdict and that the evidence does not support the jury's $750,000 verdict.

◼ In determining whether passion or prejudice influenced a jury's award, a reviewing court must consider the amount of the award and whether the damages were induced by (1) incompetent evidence, (2) misconduct by the court or counsel at trial, or (3) any other action at trial that may reasonably be said to have swayed the jury. *Loudy v. Faries* (1985), 22 Ohio App.3d 17, 19, 22 OBR 52, 54, 488 N.E.2d 235, 237. Here, there is no evidence that passion or prejudice influenced the jury's award. The trial court certainly erred in admitting the testimony of the transit authority board member who accused

the transit authority of corruption and incompetence. However, this testimony in and of itself would not appear to have unfairly influenced the jury. Further, the trial court carefully restricted testimony concerning the prior rape in order to avoid unfair prejudice. The plaintiff's testimony concerning her rape and subsequent mental anguish could properly be considered by the jury in determining a compensatory award.

Although passion or prejudice did not influence the jury's verdict, the trial court should have ordered remittitur since the evidence does not support the $750,000 award. Cf. *Cox v. Oliver Machinery Co.* (1987), 41 Ohio App.3d 28, 35, 534 N.E.2d 855, 862. The plaintiff has shown only $650 in actual damages. She admitted that she did not miss any work as a result of the rape. She claims that the rape caused her to withdraw from a court reporting school and that that represented a "substantial" loss of future income. However, these damages are too speculative, since at the time of the rape the plaintiff had only completed a fraction of her schooling. More important, the plaintiff failed to produce any evidence showing the actual difference between her foreseeable income at her present occupation and projected earnings as a court reporter.

We recognize that the plaintiff suffered mental injuries that are verified by expert testimony. These injuries could be fairly compensated. However, we conclude that $750,000 for the plaintiff's mental injuries was patently unwarranted. Accordingly, we conclude that the trial court erred in failing to grant remittitur and reducing the award to an amount which would fairly compensate the plaintiff.

## VII

The plaintiff, in her two assignments of error, asserts that the trial court abused its discretion in overruling her motion for prejudgment interest. In particular, she claims that the trial court erred in finding that the transit authority had made a good faith effort to settle the case as required pursuant to R.C. 1343.03(C).

"The decision as to whether a party's settlement efforts indicate good faith is generally within the sound discretion of the trial court." *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 159, 25 OBR 201, 203, 495 N.E.2d 572, 574. A reviewing court shall not reverse the trial court's determination on this issue absent a showing that the trial court abused its discretion. *Id.* The term "abuse of discretion" connotes more than an error of law or judgment; it implies an unreasonable, arbitrary, or unconscionable attitude on the part of the trial court. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

"A party has not 'failed to make a good faith effort to settle' under R.C. 1343.03(C) if he had (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." *Kalain v. Smith, supra,* at syllabus.

In this case, the transit authority had an objectively reasonable belief that it had no liability. As this court has determined and as the transit authority has maintained throughout these proceedings, the plaintiff had no basis for obtaining relief for her injuries from the transit authority. Accordingly, the transit authority had no obligation to tender any settlement offer although the record establishes that the transit authority in fact offered a $40,000 settlement prior to trial. We conclude that the trial court correctly exercised its discretion in denying the motion for prejudgment interest.

The plaintiff further contends that the trial court erred in excluding evidence, at the hearing on the plaintiff's motion, of the transit authority's failure to cooperate in pretrial discovery. However, any error in the trial court's ruling would be harmless since the transit authority had no duty to settle the case due to its objective, reasonable belief that it had no liability. Cf. Evid.R. 103(A) (error must affect substantial right of complaining party).

Accordingly, we overrule the plaintiff's two assignments of error and affirm the trial court's denial of her motion for prejudgment interest. Based upon our disposition of the transit authority's first assignment of error, we order judgment for the transit authority on the plaintiff's claim.

*Judgment accordingly.*

DAVID T. MATIA, P.J., and MITROVICH, J., concur.

PAUL H. MITROVICH, J., of the Lake County Court of Common Pleas, sitting by assignment.