WATKINS et al., Appellees,

₀v.

CLEVELAND CLINIC FOUNDATION, Appellant, et al.

[Cite as *Watkins v. Cleveland Clinic Found.* (1998), 130 Ohio App.3d 262.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 72838.

Decided Nov. 23, 1998.

266

**268**

*Charles Kampinski Co., L.P.A., Charles Kampinski & Christopher Mellino,* for appellees.

*Roetzel & Andress* and *John V. Jackson II; Bonezzi, Switzer, Murphy & Polito, Steven J. Hupp* and *Edward E. Taber; Jones, Day, Reavis & Pogue* and *David A. Kutik; Mansour, Gavin, Gerlack & Manos* and *Douglas C. Leak,* for appellant.

JAMES D. SWEENEY, Judge.

Defendant-appellant Cleveland Clinic Foundation appeals from the jury verdict in favor of plaintiffs-appellees Birdie Watkins, by and through her guardian (and

son), David Pollard, and her husband, Thomas Watkins.[1] For the reasons adduced below, we affirm in part and reverse in part, and vacate the award of punitive damages.

In April 1995, Birdie Watkins, a sixty-year-old woman, went to the appellant complaining of a sinus infection. Watkins was referred to Dr. Isaac Eliachar, an attending surgeon in appellant's Ear, Nose, and Throat ("ENT") Department, who noted that no infection was present, but did diagnose a deviated septum in the patient's nose and advised that a surgical procedure known as septoplasty be performed. When asked by the patient whether he would be performing the procedure, Eliachar stated that he did not operate alone. The doctor testified that he advised the patient on May 4, 1995, of the risks and benefits of the surgery and that he would operate with the participation and assistance of medical residents. It is uncontested that the appellant's billing records referred to Eliachar as the surgeon of record. Further, the patient did not sign a written consent form.

May 5, 1995, was the date of the surgery. On that morning, Eliachar was scheduled to perform four elective surgeries in two adjoining operating rooms.[2] The anesthesiologist was Dr. Marc Popovich, who was also involved in more than one surgery at the time and, like Eliachar, moved between operating rooms during the patients' procedures. The nurse anesthetist, who assisted Popovich in Popovich's absence, was Dennis Woods, R.N. The chief resident of the ENT Department, Dr. Marc Guay, performed the surgery on Watkins. Eliachar, who was listed in the operation records and discharge summary as the performing surgeon, allegedly supervised periodically Guay's work as Eliachar moved between the adjoining operating rooms.

Guay testified that he first met the patient on the day of the surgery in the preoperation holding area minutes before the patient was transported to the operating room. He also testified that Eliachar assigned the surgery to him and that Eliachar did not even scrub up that morning. Guay, upon meeting the patient, told the patient that he "would be operating on her *with* Dr. Eliachar." (Emphasis added.) Guay did not explain to the patient what he meant by that phrase. Guay did not know extubation parameters.

---

1. Mr. and Mrs. Watkins are African–Americans.

2. Eliachar testified that it is normal procedure for surgeons at the Cleveland Clinic, and elsewhere, to schedule multiple operations on a particular morning, even though the surgeon could not physically perform all the surgical operations. However, Eliachar now personally performs the operations on his patients.

During the operation, which began at 7:30 a.m. and ended at 11:10 a.m., the patient was under a general anesthesia and was intubated[3] by the nurse anesthetist to ensure normal breathing. According to Popovich, he did not inform the patient that a nurse anesthetist would perform the intubation and extubation and did not indicate that he, the anesthesiologist, would not be present throughout the operation. The septoplasty was uneventful. According to Eliachar, it was the surgeon's ultimate responsibility to ensure that the patient maintained an adequate airway during and after the operation. Yet Eliachar could not recall whether he was present when the patient was extubated. He believed that the nurse anesthetist extubated the patient. Popovich was not present for the extubation and did not evaluate the patient between the operating room and the postanesthesia care unit ("PACU"). The nurse anesthetist stated that the patient was extubated at approximately 10:30 a.m. in the operating room and that he and Guay then transported the patient to the PACU. On the way to the PACU at 10:35 a.m., the patient's heart rate was eighty-five beats per minute according to nurse Woods's records. Yet the nurse's notes from PACU indicate that at 10:35 a.m., when the patient was admitted to the PACU, her heart rate was fifty beats per minute. The nurse anesthetist's records also indicate that the patient was awake and responsive when he transported her to the PACU, yet the PACU records indicate that the patient was unresponsive, emitting a large amount of clear urine and not moving. At 10:40 a.m., the nurse anesthetist's records indicate that the patient's heart rate was seventy-eight to eighty beats per minute, while the PACU nurse's record states thirty beats per minute, a rate that is admittedly life-threatening, according to the nurse anesthetist. When the heart rate hit thirty beats per minute, the nurse anesthetist recalls, resuscitative measures were begun on the patient. The patient was given cardiopulmonary resuscitation and was reintubated at 10:50 a.m.

Popovich testified that it would have been preferable for the patient to have been awake and responsive when extubated and if the patient was not awake and responsive, it would have been inappropriate to extubate the patient. According to the anesthesia record, Popovich stated that the patient was in trouble at the time she was admitted to the PACU.

Dr. Howard Tucker, a board-certified neurologist and plaintiffs' expert witness,[4] testified that the patient, who is in a persistent vegetative state but otherwise healthy, is unable to communicate or care for herself, has no cognitive or conscious awareness, and requires full-time care. The patient has a feeding

---

3. Intubation is the act of placing an endotracheal tube down a patient's throat to provide a clear airway.

4. Dr. Tucker is also a licensed attorney in the state of Ohio, but does not practice law.

tube, which admits liquid food directly to the stomach, and a tracheostomy to permit a direct airway through her windpipe. It was his medical opinion that the patient had the probability for a full-life expectancy.

George Cyphers, a certified rehabilitation counselor, testified on behalf of plaintiffs as to the life-care plan developed for the patient, which details the medications and health care supplies, equipment, and services, and their attendant costs, that will be needed over the patient's lifetime.

John Burke, who holds a doctorate in economics, testified for the plaintiffs regarding financial losses of the patient experienced as a result of the patient's injury. The witness calculated the patient's statistical life expectancy from the date of the injury as 22.8 years, to an age of 80.1 years. Wage loss from her employment as an autoworker at General Motors was calculated at a present value of $299,360. The amount needed to medically maintain the patient in her home was calculated as $5,511,870. Burke expressed various concerns about the report of defendant's economic expert, Mr. Morbach, including (1) the forecast estimation of the inflation rate over time, which Burke stated no one could do with any certainty, (2) the use of higher-risk investments as a basis for an annual interest rate to calculate the present value of money for annuity purposes,[5] (3) the fact that Morbach is not an economist, and (4) the fact that Morbach's analysis used a ten-year time span rather than Burke's 22.8 year time span, the effect of which would be to lessen the final amount.

Thomas Watkins, the patient's husband, testified that Eliachar told him that he had performed the operation. Watkins also detailed the personal life he enjoyed with his wife and family and the effect of the injury on the family.

Melanice Watkins, the patient's daughter, testified that as of the date of the trial in June 1997, her mother's medical bills totaled $555,551.81. She also testified as to the effect of her mother's condition on the family.

The defense case consisted of the testimony of five witnesses. Dr. Donald Mann, a board-certified neurologist, testified as a defense expert. Mann's medical opinion was that Mrs. Watkins's life expectancy was five to ten years, but in rare cases such patients can live thirty to forty years. Mann, who did not examine Watkins, further opined that patients in a persistent vegetative state demonstrate movement but such movement is merely an autonomic reflex and not the product of will or a thinking brain. The witness also stated that it was his experience that no patient in a persistent vegetative state has been successfully treated in the home, which is what Watkins's family wishes to do.

---

5. This factor is important because with a higher rate of return in the equation, the present value of the amount is decreased.

The second witness for the defense was Guay, who generally reiterated his earlier testimony. In addition, Guay stated that he personally informed Watkins during preop that he would be operating on her that day, but did not tell her that Eliachar would not be performing any of the surgery on her. On cross-examination, the witness stated that he told Watkins that he would be performing the surgery with Dr. Eliachar. The witness also stated that Eliachar was present in the operating room overseeing the procedure. Guay denied being involved in the extubation of Watkins, but did assist nurse Woods in transporting the patient from the operating room to the PACU. Guay noticed no problems with the patient when they arrived at the PACU, and left that area shortly after delivering the patient. According to him, there is no signed consent form by Watkins in the hospital records.

The third defense witness was Latressa Albert, the daughter of Watkins, whose deposition was read into evidence. Albert testified that she spoke with Eliachar the night after the surgery and that Eliachar did not specifically state then that he had done the surgery.

The fourth defense witness was Thomas Watkins, who generally reiterated his earlier testimony, adding that the family had incurred a debt balance of $27,-129.12 owed to MedBridge, a care facility that provided services to Watkins.

The fifth defense witness was Timothy Morbach, an investment professional at the brokerage firm of Kidder, Peabody and Company specializing in structured settlements involving injured persons and estates. Morbach reviewed the life-care plan prepared by plaintiffs and came to the conclusion that an annuity of $1,165,154 (present value) would cover in-home care for five years of life expectancy, or $1,813,396 (present value) for in-home care for ten years of life expectancy. If the patient were cared for in a nursing home facility, an annuity of $388,156 (present value) would cover a life expectancy of five years, or $610,013 (present value) for a life expectancy of ten years. These figures, which cover only the cost of medical care for Watkins, would start in 1997 and would not cover Mrs. Watkins from the time in 1995 when she entered her persistent vegetative state. The witness also stated that he used various inflation factors and that recognizing inflation was proper in his industry. On cross-examination, the witness stated that the annuity was premised on women sixty-two and seventy-eight years of age at present. On further cross-examination, he stated that for a twenty-year life expectancy, the amount needed to fund the life-care plan would be $8,009,679, which would be discounted to a present value of $4,548,974.

The jury found for plaintiffs on the fraud and battery claims before it and awarded compensatory damages to Watkins in the amount of $9,660,000.[6] The

---

6. The defendant stipulated to negligence in the action and the jury was informed of this fact.

jury also awarded damages of $1,300,000 to the husband of Mrs. Watkins for loss of consortium.

Thereafter, the court heard testimony offered by Kevin P. Roberts, the treasurer of the Cleveland Clinic Foundation, a not-for-profit organization, relative to the issue of punitive damages. In 1996, the defendant had total net assets in the amount of $766,076,000, an increase of approximately $100,000,000 from 1995. Actual cash on hand at the end of 1996 was $17,985,000 from income from operations in the amount of $19,406,000. The total excess of revenues over expenses for 1996 was $57,708,000. At the close of this testimony and subsequent to closing arguments, the jury awarded punitive damages in the amount of $3,500,000. Thus, the total damage award was $14,460,000.

Defendant-appellant presents nine assignments of error.

## I

█ "The trial court committed prejudicial error in disallowing one of the Cleveland Clinic's peremptory challenges based upon an unsupportable claim of racial discrimination."

The standard of review for a claim of excluding jurors through the use of peremptory challenges based upon racial motivation was originally set forth in *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. The *Batson* test was recently applied to a civil case in *Hicks v. Westinghouse Materials Co.* (1997), 78 Ohio St.3d 95, at 98–99, 676 N.E.2d 872, at 876–877:

█ "The United States Supreme Court set forth in *Batson* the test to be used in determining whether a peremptory strike is racially motivated. First, a party opposing a peremptory challenge must demonstrate a prima-facie case of racial discrimination in the use of the strike. *Id.* at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87. To establish a prima-facie case, a litigant must show he or she is a member of a cognizable racial group and that the peremptory challenge will remove a member of the litigant's race from the venire. The peremptory-challenge opponent is entitled to rely on the fact that the strike is an inherently 'discriminating' device, permitting ' " 'those to discriminate who are of a mind to discriminate.' " ' *State v. Hernandez* (1992), 63 Ohio St.3d 577, 582, 589 N.E.2d 1310, 1313, certiorari denied (1992), 506 U.S. 898, 113 S.Ct. 279, 121 L.Ed.2d 206. The litigant must then show an inference or inferences of racial discrimination by the striking party. The trial court should consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present. See *Batson* at 96–97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

 "Assuming a prima-facie case exists, the striking party must then articulate a race-neutral explanation 'related to the particular case to be tried.' *Id.* at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88. A simple affirmation of general good faith will not suffice. However, the explanation 'need not rise to the level justifying exercise of a challenge for cause.' *Id.* at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. The critical issue is whether discriminatory intent is inherent in counsel's explanation for use of the strike; intent is present if the explanation is merely a pretext for exclusion on the basis of race. *Hernandez v. New York* (1991), 500 U.S. 352, 363, 111 S.Ct. 1859, 1868, 114 L.Ed.2d 395, 408.

 "Last, the trial court must determine whether the party opposing the peremptory strike has proved purposeful discrimination. *Purkett v. Elem* (1995), 514 U.S. 765, 766–767, 115 S.Ct. 1769, 1770, 131 L.Ed.2d 834, 839. It is at this stage that the persuasiveness, and credibility, of the justification offered by the striking party becomes relevant. *Id.* at 768, 115 S.Ct. at 1771, 131 L.Ed.2d at 839. The critical question, which the trial judge must resolve, is whether counsel's race-neutral explanation should be believed. *Hernandez v. New York,* 500 U.S. at 365, 111 S.Ct. at 1869, 114 L.Ed.2d at 409."

The final element of the standard enunciated in *Hicks,* the issue of credibility, was explained as follows:

"Review of a *Batson* claim largely hinges on issues of credibility. Accordingly, we ordinarily defer to the findings of the trial court. See *Batson* at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21. Whether a party intended to racially discriminate in challenging potential jurors is a question of fact, and in the absence of clear error, we will not reverse the trial court's determination. *Hernandez v. New York,* 500 U.S. at 369, 111 S.Ct. at 1871, 114 L.Ed.2d at 412; *State v. Hernandez,* 63 Ohio St.3d at 583, 589 N.E.2d at 1314. Trial judges, in supervising voir dire, are best equipped to resolve discrimination claims in jury selection, because those issues turn largely on evaluations of credibility. See *Batson* at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21." *Id.* at 102, 676 N.E.2d at 878–879.

The venire pool before the trial court contained three prospective jurors who happened to be African–American: juror No. 5, Carl Cunningham, who had been employed as an insurance agent for eight years in the past, had some minor medical training involving advanced first aid and life-saving techniques while employed as a fireman, and had been pleased to have successful arthroscopic surgery performed on his knees at the defendant hospital; juror No. 9, Myrtle Patton, who is employed by defendant as a receptionist in the surgery department and who knew many of the actors who would testify and who were likewise employed by the defendant; and juror No. 11, Vera Jackson, who is employed by defendant as a unit secretary, but did not know any of the persons expected to be

called to testify. Before jurors 9 and 11 were placed in the jury box for voir dire, the defendant asked the court in an *in camera* hearing to excuse those two jurors for cause without further questioning solely because they were employed by the defendant. See R.C. 2313.42(E). Those two jurors were questioned by the trial court and counsel and were then dismissed for cause upon the request of the defendant.

The defendant's first peremptory challenge was exercised against juror No. 6, Mrs. Papp, who was a Caucasian psychiatric nurse and whose aunt had experienced a bad result during a surgery performed at defendant hospital, but also expressed her belief that she could perform as a juror fairly and without bias. Papp was excused because of her medical background, not for her relative's bad experience at the defendant's hospital.

Defendant's second peremptory challenge was exercised against juror No. 5, Cunningham. When pressed by the court, defense counsel stated the reason for striking this juror was that Cunningham had had training in medicine and that defense counsel had had bad experiences with nurses and other persons with medical training in other medical malpractice cases. Over the strenuous objection of the defense, the trial court overruled this peremptory challenge, essentially finding that the race-neutral reasons provided by defendant for the peremptory challenge were merely a pretext:

"[Y]our reason for peremptoring him otherwise is not appropriate. That it's not applicable to circumstances of his education and background.

" * * *

"They [the reasons for the peremptory challenge] are inappropriate, and I'm also establishing for the record, I would indicate the pattern being your insistence that your own employees, you know, be removed and their race as well. You know if you want that on the record, there it is. And that is the pattern that I'm finding. That's the end of the argument."

The first prong of the *Hicks* standard, that of a prima facie case of racial discrimination, was satisfied. Defendant had excused two of the three African–American members of the venire prior to exercising the peremptory challenge on the sole remaining black juror, Cunningham. The inference of racial discrimination by the defendant in striking Cunningham from the venire is drawn from the fact that while he was struck on the basis of his medical experience, two other jurors, No. 4 and 18, had as much medical training as Cunningham or significantly more, yet were seated on the jury. Furthermore, the fact that the defendant used its first peremptory challenge to strike Papp, who also had significantly greater medical training than Mr. Cunningham, is of little note. As the trial court surmised from judging the credibility and intent of the parties and counsel,

the true problem defendant had with Papp was that she had a relative who had experienced a bad result from surgery at the defendant's hospital, which left Papp with a feeling she described as "inevitable." These facts led the defendant to seek, and receive, permission to voir dire Papp on that issue in chambers and out of the presence of the venire. The only way for defendant to prevent Papp from being seated on the jury was to exercise a peremptory challenge. The trial court could properly conclude that the race-neutral explanation for the challenge to Cunningham advanced by defendant was a ruse. Absent clear error, we must defer to the trial court's determination of purposeful discrimination. *Hicks, supra,* 78 Ohio St.3d at 102, 676 N.E.2d at 878–879.

The first assignment of error is overruled.

## II

█ "The trial court erred by communicating with and instructing the jury without notifying counsel and allowing them to participate."

The questions presented to the trial court by the jury and the responses by the court are as follows:

"First question I'm reading here just by the fact it's on top, 'Can the jury consider pain and suffering for Mr. Watkins?' Signed Mary Ann Shipman. Dated 6/10/97. The judge's response to that in the judge's writing, the date, 'No, not in the legal sense. Only consider his loss of her care, comfort, companionship and service.' Signed by Judge Pokorny.

"The next one is, 'Do all eight jurors sign the form or just the majority which agree?' Signed by Mrs. Shipman. 6/10/97 is the judge's answer, 'Only those who agree should sign.' Signed by Judge Pokorny.

"Next question, 'Definition of fraud states intent to mislead. Intent is not mentioned in the interrogatories. Should it be taken into consideration in the answers to the interrogatories?' Signed Mary Ann Shipman. Judge's response dated 6/10/97 says, 'Yes.' The judge's signature.

"Next one is, 'May we have legal definition of consortium?' Mary Ann Shipman. Says over on the back is the response dated 6/10/97, 'Consortium is the care, comfort, companionship and services provided by Birdie Watkins to her spouse Thomas Watkins.' Signed by the judge.

"The last one is, 'Can we answer yes to all three interrogatories on fraud and no to the fraud verdict?' Signed Mary Ann Shipman. Dated 6/10/97. Judge's response, 'The answers to interrogatories must be consistent with verdict.' Judge Pokorny."

■ Although these communications were *ex parte*,[7] the responses by the trial court, when viewed in their entirety, were correct statements of the law and were consistent with the jury instructions or otherwise properly supplemented the jury instructions (on the issue of considering intent). Thus, there was no demonstrable prejudice to the defendant. Absent prejudice, the claimed error is not reversible. See *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301, 1308–1309.

The second assignment of error is overruled.

## III

■ "The trial court erred by denying the Cleveland Clinic's motions for a directed verdict on plaintiff's fraud claim and by failing to require the jury to make findings regarding all of the elements of fraud."

The standard of review for a directed verdict was recently stated by this court in *Harris v. Mt. Sinai Med. Ctr.* (May 28, 1998), Cuyahoga App. No. 72688, unreported, 1998 WL 274507, at 5:

"Civ.R. 50(A)(4) establishes the procedure for a court to follow in granting a directed verdict:

" 'When a motion for a directed verdict has properly been made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon a determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.'

"It is the duty of the court to submit an issue to the jury if there is sufficient evidence to permit reasonable minds to reach different conclusions on that issue; conversely, the court must withhold an issue from the jury when there is not sufficient evidence presented relating to the issue to permit reasonable minds to reach different conclusions. See *O'Day v. Webb* (1972), 29 Ohio St.2d 215 [58 O.O.2d 424], 280 N.E.2d 896."

■ In order to prevail upon a claim of fraud, a plaintiff must show all of the following elements:

"(a) a representation or, where there is a duty to disclose, concealment of a fact,

"(b) which is material to the transaction at hand,

---

7. *Ex parte* communications to the jury by the trial court are anathema and should not be countenanced except in times of extraordinary pressing necessity.

"(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

"(d) with the intent of misleading another into relying upon it,

"(e) justifiable reliance upon the representation or concealment, and

"(f) a resulting injury proximately caused by the reliance." *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus, citing *Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167, 10 OBR 500, 462 N.E.2d 407.

When seeking money damages, a plaintiff is required to plead and prove these elements by a preponderance of the evidence. *Household Fin. Corp. v. Altenberg* (1966), 5 Ohio St.2d 190, 34 O.O.2d 348, 214 N.E.2d 667, syllabus. Fraud is never presumed, but must instead be affirmatively proved. *Beneficial Fin. Co. v. Smith* (1968), 15 Ohio App.2d 208, 210, 44 O.O.2d 368, 369–370, 240 N.E.2d 106, 107–108.

Evidence was presented that demonstrated the following: (1) that Eliachar represented to Watkins that he would be operating on her, albeit with assistance, after Watkins specifically asked Eliachar whether he would be performing the surgery, (2) that Eliachar performed none of the actual operation on Watkins (a fact that was not disclosed to Watkins prior to the surgery), and instead merely made casual and intermittent supervision of the procedure, (3) that Eliachar, when making the representation to the patient, knew that he was scheduled to perform simultaneous surgeries on that date, (4) that Eliachar, as the performing surgeon of record, had the responsibility to monitor the patient throughout the entire operation, including postoperation procedures on his patient, and admittedly knew the extubation parameters and would have prevented Watkins's premature extubation had he been the surgeon in the operating room at the time, (5) that Eliachar did not return to the operating room prior to the premature extubation of the patient in that same operating room, (6) that it was not the responsibility of Guay to supervise the extubation of the patient, and (7) the premature extubation caused the injury to the patient. Based on this evidence, the elements of fraud were demonstrated and the trial court did not err in denying the motion for directed verdict on that issue.

As to the appellant's argument that the court erred in answering jury interrogatories on the issue of fraud, the record reflects that there was no timely objection by defendant-appellant. Accordingly, any error is waived for appellate purposes. *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 436 N.E.2d 1001.

The third assignment of error is overruled.

## IV

■ "The trial court erred by denying the Cleveland Clinic's motions for a directed verdict on plaintiff's battery claim and by giving improper instructions on battery."

The court in *Allore v. Flower Hosp.* (June 27, 1997), Lucas App. No. L–96–329, unreported, 1997 WL 362465, at 5, states the following with respect to the tort of battery in a medical setting:

"In *Anderson v. St. Francis–St. George Hosp.* (1992), 83 Ohio App.3d 221, 225, 614 N.E.2d 841 [844], the First District Court of Appeals set forth the law controlling the disposition of this assignment of error:

" 'Concerning the substantive law of this dispute, the rule is that a person commits a battery when he unlawfully strikes or touches another. *Green v. Drungold* (1950), 60 Ohio Law Abs. 445, 447, 101 N.E.2d 906, 908. In a medical setting, when a physician treats a person without consent, the doctor has committed a battery. *Leach v. Shapiro* (1984), 13 Ohio App.3d 393, 395, 13 OBR 477, 479, 469 N.E.2d 1047, 1051. Moreover, under the doctrine of respondeat superior, any person who controls the physician in a principal-agent relationship is liable for unlawful acts by the physician that are within the scope of that relationship. *Klema v. St. Elizabeth's Hosp.* (1960), 170 Ohio St. 519, 527, 11 O.O.2d 326, 330, 166 N.E.2d 765, 771.' " See, also, *Vignal v. Cleveland Clinic Found.* (September 26, 1996), Cuyahoga App. No. 69603, unreported, 1996 WL 547945, at 3.

■ A claim of battery, which is an intentional, nonconsensual touching, requires that causation and damages also be shown. *Anderson v. St. Francis–St. George Hosp.* (1996), 77 Ohio St.3d 82, 84, 671 N.E.2d 225, 227, citing *Love v. Port Clinton* (1988), 37 Ohio St.3d 98, 524 N.E.2d 166.

In the case before us, in addition to the seven factors set forth in the previous assignment, it is beyond doubt that Eliachar controlled the actions of Guay through his assignment of the procedure to Guay and the supervision of Guay. Also, there was testimony from Guay that he informed Watkins before she was transported to the operating room that he would be performing the operation, yet there is no corroboration of consent to Guay by the patient in the medical record; thus, consent is a question for the trier of fact. The allegedly unconsensual touching by Guay, which is attributable to Eliachar, and then to the defendant hospital, and which permitted Eliachar to be absent at the time of the premature extubation of the patient in the operating room, caused the injury and resulting damages to the patient.

These facts demonstrate a prima facie cause of action for battery sufficient to be placed into the hands of the jury.

The appellant next argues in this assignment of error that the jury instructions relative to battery were inaccurate and misleading. The charge given by the court relative to battery states:

"With respect to the next count, battery, a battery is an intentional unconsented contact with another. A surgical operation on the body of a person is a technical battery unless the patient consented to it.

"The plaintiff Birdie Watkins has brought this action alleging that consent was not given to the defendant Cleveland Clinic to perform the surgery in the manner in which it occurred.

"The defendant denies a battery occurred. In order for the plaintiff to prevail, you must find that the following facts have been proven by a greater weight of the evidence, that Birdie Watkins was not told that Dr. Eliachar would not be performing the surgery upon her on May 5, 1995, and that Dr. Eliachar did not perform the surgery in the manner you find he expressed he would to Birdie Watkins.

"You must determine under the facts as you find them whether the surgery performed constituted an intentional and unconsented contact in light of what Mrs. Watkins was told by Cleveland Clinic employees regarding the performance of the surgery.

"It is no defense to a battery claim that the surgery was performed skillfully. If you find that the plaintiff has proved the elements of battery by a greater weight of the evidence, your verdict must be for the plaintiff on that issue.

"If you find that the plaintiff has failed to prove the evidence by the greater weight of the evidence, your verdict must be for the defendant on the issue of battery.

"Finally, with respect to the damages in the case, the issue here is what would be fair compensation for the plaintiff's injuries and damages? You will determine from the preponderance of the evidence an amount of money that will reasonably compensate the plaintiff for the actual injuries sustained."

The defendant's proposed instructions relative to battery stated:

## "PROPOSED JURY INSTRUCTION NO. 1

"219.02 Battery

"1. BATTERY. Battery is intentional, unconsented, contact with another.

" * * *

"PROPOSED JURY INSTRUCTION NO. 13

"11.10 Proximate cause

"1. SEPARATE ISSUE. A party who seeks to recover for [fraud or battery] must prove not only that the other party [committed fraud and/or battery], but also that such fraud and/or battery was a proximate or direct cause of injury.

"2. DEFINED. Proximate cause is an act or failure to act which in the natural and continuous sequence directly produces the injury, and without which it would not have occurred. Cause occurs when the injury is the natural and foreseeable result of the act or failure to act."

■ The defendant's first proposed jury instruction was given virtually verbatim by the trial court in its instructions to the jury. As to the term "cause," the court instructed the jury that "[C]ause means the natural and probable consequences of the act. An injury is caused when it happens in the natural and continuous sequence of events and without which it would not have occurred." This charge is not misleading as it tracks the defendant's proposed charge on cause.

■ While it is true that the court did not address proximate cause in its charge on battery, the effect of any error on the damage award is entirely speculative since the award was not apportioned between the separate causes of action, but was given in a general award. Without this predicate of prejudice, the error can be deemed to be harmless.

■ Appellant next argues that the trial court erred in not instructing the jury that it "had to find that Dr. Guay's intentional contact with Mrs. Watkins was without her consent," and in instructing that battery could be shown if "Dr. Eliachar did not perform the surgery in the manner you find he expressed he would to Birdie Watkins." We conclude that the given instructions, when viewed in the context of the overall charge given by the court, adequately informed the jury of its obligations relative to the claim for battery.

The fourth assignment of error is overruled.

V

■ "The trial court erred by denying the Cleveland Clinic's motions for a directed verdict on plaintiff's claim for damages for pain and suffering and by instructing the jury on present and future pain and suffering and 'hedonic' damages."

In this assignment, appellant argues that pain and suffering and hedonic losses attributable to Mrs. Watkins should not have been permitted because she was not able to experience them due to her permanently unconscious state.

While defendant's medical expert (Dr. Mann) opined that Watkins did not have brain function apart from basic autonomic responses, plaintiffs' medical expert (Dr. Tucker) stated, when referring to patients in persistent vegetative state, that "we don't know what their thought processes are" because such patients cannot verbalize and that such patients "cannot formulate ideas as far as we know." This is not to say, conclusively, that such patients cannot feel pain or suffer as a result of their physical condition. This view is buttressed by the videotape of Watkins, which was played for the jury to demonstrate the home care needs of the patient, and which showed Watkins wincing and flinching, displaying obvious discomfort, as her tracheostomy tube was being cleaned. Finally, during the cross-examination of Melanice Watkins by the defendant, defense counsel asked the witness whether she had any further thought on her mother's consciousness and ability to feel pain, and whether any other professional had discussed the matter with her since her mother left the hospital. The defense having opened the door, Melanice Watkins, on redirect examination, responded by telling of statements attributed to an Erie, Pennsylvania neurologist, who treated Mrs. Watkins while she was staying at a facility there. That physician allegedly told Melanice Watkins that the patient "very well probably does hear and she is aware, but the brain has been so damaged and is too weak that it can't send signals out to respond." Given these conflicting viewpoints, the matter was a question of fact for the jury to resolve, assessing the weight to such opinions as it deemed appropriate.

As to future pain and suffering, it is undeniable that Watkins is in a permanent vegetative state. Her condition will not change over her life expectancy. It is also reasonably certain that her damages will also likely continue during that life expectancy. Thus, the jury charge on this issue was proper. *Patton v. Cleveland* (1994), 95 Ohio App.3d 21, 30, 641 N.E.2d 1126, 1131. Even were we to assume that the instruction on future pain and suffering was error, the failure of the verdict to apportion the damages between present and future pain and suffering precludes recognizing prejudice to the defendant and resulting error. Cf. *Sentinel Consumer Prod. v. Mills, Hall, Walborn & Assoc., Inc.* (1996), 110 Ohio App.3d 211, 673 N.E.2d 967.

The fifth assignment of error is overruled.

## VI

"The trial court erred by refusing to give the Cleveland Clinic's proposed jury instruction on the cost of an annuity."

In discussing the instructions to be given to the jury, the following colloquy occurred between defense counsel and the trial court before closing arguments:

"MR. JACKSON: Judge, one additional, you are going to charge the jury on the cost of annuity under the statute, 2317.62?

"THE COURT: No. I'm only going to tell them whatever amount of money they deem appropriate has to be present value. That's all that the law requires." [8]

The defendant's proposed instruction relative to the cost of an annuity, which was found in 1 Ohio Jury Instructions (1996) 214, Section 23.09, stated:

## PROPOSED JURY INSTRUCTION NO. 4

"23.09 Tort actions based on claims for future damages; cost of annuity

"You have heard evidence about the cost of an annuity in connection with the award of future damages, if any. One method of determining the present value of future damages is the cost of an annuity. You may consider that evidence in making your decisions about the amount of future damages and give it such weight as you think proper."

Pursuant to R.C. 2317.62(B), the cost of all annuities was expressed through the economic testimony of both parties in terms of present value. The parties argued the present value of the annuities in their closing arguments. The court instructed the jury that damages should be in an amount that would reasonably and fairly compensate the plaintiffs. After the court instructed the jury, the court asked the parties if they had any problems with the charge. The defense, which did suggest several objections to the charge as given, did not with specificity object to informing the jury that the cost of an annuity must be represented by its present value. This represents a waiver of that argument on appeal. *Schade, supra.* Even if it were not considered as waived, we conclude that the overall charge, when viewed against the evidence, the arguments of counsel to the jury, and the amount of the award for Mrs. Watkins, adequately expressed the pertinent law to the jury. *State v. Price* (1979), 60 Ohio St.2d 136, 398 N.E.2d 772, paragraph four of the syllabus. Also, since the damage award for Mrs. Watkins is not apportioned between the different elements of her overall

---

8. R.C. 2317.62(B) allows evidence on the cost of an annuity on the issue of future damages:

"Subject to division (A)(3)(b)(ii) of section 2125.02 of the Revised Code and consistent with the Rules of Evidence, any party to a tort action may present evidence of the cost of an annuity in connection with any issue of recoverable future damages. If that evidence is presented, the trier of fact may consider that evidence in determining the future damages suffered by reason of an injury or loss to person or property that is a subject of the tort action. If that evidence is presented, the present value in dollars of any annuity is its cost."

damage award (wage loss, pain and suffering, current and future medical expenses, etc.), we are unable, based upon the overall award, to conclude that the jury was confused by the charge so as not to apply the present value of an annuity as its cost in determining the damage award for future medical care.

The sixth assignment of error is overruled.

## VII

■ "The trial court erred by denying the Cleveland Clinic's motions for a directed verdict on plaintiff's claim for punitive damages."

In this assignment, appellant argues that the issue of punitive damages was improperly permitted to go to the jury because there was no demonstration of actual malice.

In *Malone v. Courtyard by Marriott* (1996), 74 Ohio St.3d 440, 445–446, 659 N.E.2d 1242, 1246–1248, a case that determined whether the granting of a directed verdict on the issue of punitive damages was proper, the court stated:

"The law of Ohio is clear on when punitive damages may be awarded:

" '[P]unitive or exemplary damages are not recoverable from a defendant in question in a tort action unless *both* of the following apply:

" '(1) The actions or omissions of that defendant demonstrate malice * * *, or that defendant as principal or master authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate; [and]

" '(2) The plaintiff in question has adduced proof of actual damages that resulted from actions or omissions as described in division (B)(1) of this section.' (Emphasis added.) R.C. 2315.21(B).

"Thus, as a threshold matter, Malone and Meador were obligated to present evidence of malice on the part of Marriott before their claim for punitive damages could proceed to the jury.

"Our case law defines 'malice' as '(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.' (Emphasis *sic*.) *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus. * * *

" * * * *

" * * * As Chief Justice Moyer noted in *Preston,* an award of punitive damages based on conscious disregard malice requires 'a positive element of conscious wrongdoing * * *. This element has been termed conscious, deliberate or intentional. It requires the party to possess knowledge of the harm that

might be caused by his behavior.' *Preston*, 32 Ohio St.3d at 335, 512 N.E.2d at 1176."

The first type of malice articulated in *Preston v. Murty, supra*, is not at issue in the present case. As to the second type of malice enunciated in *Preston*, the positive element of conscious wrongdoing was not demonstrated by the evidence. The medical evidence was that it was common practice at the defendant's hospital for interns to assist in surgical operations and be supervised by more senior surgeons. Eliachar had done this numbers of time in his practice as a surgeon. The septoplasty procedure was an uncomplicated and relatively unsophisticated procedure. The operation on Watkins, up to the extubation of the patient, was unremarkable. Guay had performed more than twelve hundred surgical procedures during his tenure at the defendant's hospital and Eliachar had no knowledge of any deficiencies in Guay's abilities as a surgeon, or Popovich's abilities as an anesthesiologist, or nurse Woods's abilities as a nurse anesthetist. In short, there was no demonstration that Eliachar was aware that his action in not performing the actual surgery on Watkins and overseeing the extubation of the patient had a great probability of causing substantial harm. Accordingly, the trial court erred in permitting the jury to consider the issue of punitive damages. Therefore, that part of the damage award is reversed and vacated.

The seventh assignment of error is affirmed.

## VIII

■ "The jury verdict should be reversed because it was based on passion and prejudice."

In this assignment, appellant argues that plaintiffs' counsel, attorney Charles Kampinski, appealed to the passion and prejudice of the jury through a number of alleged mischaracterizations of the evidence and/or inflammatory statements to the jury.

■ In determining whether passion or prejudice affected a jury's damage award to the point of necessitating a new trial, a reviewing court must consider the amount of the award and whether the damages were induced by (1) incompetent evidence, (2) misconduct by the court or counsel at trial, or (3) any other action at trial which may reasonably be said to have swayed the jury. *Shelton v. Greater Cleveland Regional Transit Auth.* (1989), 65 Ohio App.3d 665, 682, 584 N.E.2d 1323, 1334; *Loudy v. Faries* (1985), 22 Ohio App.3d 17, 19, 22 OBR 52, 54, 488 N.E.2d 235, 237.

In light of the evidence presented and the severity of the injuries sustained by plaintiffs, the amount of the award, viewed independently, was supported by that evidence and does not shock the conscience.

Turning to the remaining three criteria set forth in *Shelton*, the first example of alleged misconduct by plaintiffs' counsel was the use of an allegedly outdated American Medical Association ("AMA") ethical opinion that identified the action of a surgeon of record in permitting an operation to be performed by another surgeon without the knowledge and consent of the patient as "ghost surgery." It was alleged that the more recent edition did not expressly use the term "ghost surgery." [9] Whether the term was in the proper edition or not, it is an accurate description for the actions at issue; thus there was no error in counsel using it before the jury. Further, appellant asserts that plaintiffs' counsel misled the jury during closing argument by telling the jury that the AMA ethical opinion prohibits such actions by surgeons and that such actions are illegal, *i.e.*, a criminal offense. There was no objection by the defense to this line of commentary. Accordingly, error therein was waived for appellate purposes.[10]

The second example purports to demonstrate that plaintiffs' counsel misled the jury by stating in closing argument that Watkins's medical bills to date total $555,000 while the actual medical bills offered into evidence total approximately $360,000. While this is a technically true statement of the documentation of the medical bills, Melanice Watkins testified that the total amount of the medical bills was approximately $550,000, and the parties argued in closing concerning the reasons for the missing documentation representing the difference between $360,000 and $550,000. The jury was free to assess the evidence and determine the amount of the medical expenses up to trial. Certainly, this $190,000 difference cannot be accurately assessed as having been awarded or not, given the lack of apportionment in the award to Mrs. Watkins. Whether the jury was misled on this point is not demonstrated.

The third example of an appeal to inflame the passion of the jury was plaintiffs showing the videotape of Watkins, in which she is seen exhibiting a painful reflex during the suctioning of her airway. The images depicted in this videotape were relevant to demonstrate that Watkins could experience pain and suffering and corroborated the plaintiffs' testimony in that regard. Thus, its introduction was not error.

The fourth example of alleged incitement of the jury was the remarks of plaintiffs' counsel during closing argument concerning (1) no inclination exhibited by the defendant to accept responsibility for payment of the damages and (2) counsel's opinion that defendants will hold the verdict in the same contempt that they exhibit for the truth:

9. The failure to use this term was fundamentally the only difference between the two editions.

10. Plain error is not argued by the appellant as to this issue.

"The defendants have shown absolutely no inclination no [*sic*] accept responsibility regarding the payment of the damages.

"MR. JACKSON: Objection, your Honor.

"THE COURT: Overruled.

"MR. KAMPINSKI: And, therefore, I have to assume that will continue. My guess is they will hold your verdict in the same contempt that they've shown for the truth.

"MR. JACKSON: Objection, your Honor.

THE COURT: Sustained. Disregard the last comment. Go ahead."

First, the comment regarding accepting "responsibility regarding payment of the damages" is a proper comment considering that defendant is fighting the claims advanced by plaintiffs at trial. It can be inferred from this posture that defendant, in litigating these claims, is not accepting responsibility, as seen through the eyes of the plaintiffs, to accept an allegedly good faith claim for relief. As to the second comment, the court promptly gave a curative instruction to the jury to disregard it, thereby minimizing to the greatest extent possible prejudice to the defendant. Further, taking the proceedings in their totality, it cannot be said that the verdict was affected to any great extent on this lone comment.

The fifth example of an incitement of the jury's passion allegedly occurred near the conclusion of plaintiffs' rebuttal closing argument, when counsel stated the following without objection by the defendant:

"If you are inflamed, it's because the facts inflame you. It inflamed me. But I'm not here asking you to punish these people."

The failure to timely object waives error at the appellate level. Even had there been an objection raised, we do not consider this comment to be error, but a fair comment on the evidence. To prohibit jurors, and counsel, from having strong feelings in a case such as this is asking the impossible considering the uncomplicated nature of the medical procedure that led up to the injury and the tragically severe injuries that followed. Much of the sting of this comment was displaced and placed in perspective when plaintiffs' counsel tempered his comment by asking that the jury not act to punish the defendant, but to "compensate these people for their loss."

The eighth assignment of error is overruled.

## IX

"The cumulative effect of the errors below requires reversal."

Based on the determinations of the previous assignments of error, this assignment is overruled.

The judgment is affirmed in part and reversed in part. The punitive damage award is vacated.

*Judgment affirmed in part*
*and reversed in part.*

ROCCO, P.J., and MICHAEL J. CORRIGAN, J., concur.