[Cite as *Forman v. Forman*, 2014-Ohio-3545.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

MICHELLE FORMAN,

    PLAINTIFF-APPELLEE,                CASE NO. 9-13-67

    v.

SCOTT FORMAN,                          O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Family Court
Trial Court No. 12 DR 0159

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

Date of Decision: August 18, 2014

APPEARANCES:

    *Kevin P. Collins* for Appellant

    *Jeff Ratliff* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Scott Forman ("Scott"), appeals the October 28, 2013 judgment entry of the Marion County Court of Common Pleas, Family Division, granting divorce from the plaintiff-appellee, Michelle Forman ("Michelle"). For the reasons that follow, we affirm in part, and reverse in part.

{¶2} The facts relevant to this appeal are as follows. Scott and Michelle were married on June 5, 2004. (Doc. No. 1). They separated in November 2011 and Michelle filed a complaint for divorce on May 11, 2012. (Aug. 6, 2013, Tr. at 69); (Doc. No. 1). This was a second marriage for them both, and while each had children from their previous marriages, no children were born as issue of this marriage. (Doc. Nos. 1, 63); (Aug. 6, 2013 Tr. at 68, 107, 162).

{¶3} Scott filed his answer and counterclaim and a motion for reconciliation on June 7, 2012. (Doc. Nos. 8, 11). On June 13, 2012, Michelle filed a motion in opposition to Scott's motion for reconciliation and her answer to Scott's counterclaim. (Doc. Nos. 12, 13). The trial court denied Scott's motion for reconciliation on August 9, 2012. (Aug. 9, 2012 JE, Doc. No. 17).

{¶4} Michelle filed a contempt motion on December 18, 2012, alleging that Scott violated the trial court's May 11, 2012 mutual restraining order. (Doc. No. 39).

{¶5} Michelle and Scott filed two sets of "Agreements and Stipulations" on March 4, 2013. (Doc. Nos. 46, 47). They filed a third "Agreement and Stipulations" on March 5, 2013. (Doc. No. 48). Because of Michelle's concerns regarding the enforcement of the "Agreements and Stipulations," the trial court issued a judgment entry on April 26, 2013, ordering, in relevant part, Scott to "take all steps necessary to have his name and his daughter's name removed from the cell phone account(s) listed in [Michelle's] name held through Verizon/Frontier Communications." (Apr. 26, 2013 JE, Doc. No. 50).

{¶6} On May 17, 2013, Michelle filed a motion for contempt against Scott for his alleged failure to remove his and his daughter's phones from Michelle's Verizon account by April 30, 2013. (Doc. No. 52). On May 23, 2013, Michelle filed a motion requesting attorney fees resulting from Scott's alleged failure to comply with discovery or otherwise negotiate timely or reasonably to resolve property or debt issues before the trial court. (Doc. No. 53).

{¶7} On June 14, 2013, Scott filed a motion for contempt, alleging that Michelle violated a number of the trial court's orders. (Doc. No. 57). On June 27, 2013, Scott filed a second motion for contempt, alleging that Michelle failed to comply with the trial court's March 19, 2013 order. (Doc. No. 67). Scott filed a third motion for contempt on August 12, 2013, alleging, in relevant part, that

Michelle violated the trial court's May 11, 2012 mutual restraining order by disposing of one of two dogs obtained during the marriage. (Doc. No. 74).

{¶8} The matter came for final hearing on June 28, 2013 and August 6, 2013 on Michelle's complaint for divorce, Michelle's contempt motions, filed December 18, 2012 and May 17, 2013, Scott's contempt motion, filed June 14, 2013, and Michelle's motion for attorney fees, filed May 24, 2013. (Oct. 28, 2013 JE, Doc. No. 77).[1] This matter also came for hearing on September 30, 2013 on Scott's contempt motion filed June 14, 2013. (*Id.*).[2] The trial court heard testimony from Michelle, Scott, David Kelley ("Kelley"), a pension consultant with QDRO Consultants Company, William Napoli, Jr. ("Napoli"), the president of, and actuary consultant with, American Benefit Evaluators, and Larry Heiser, a family law attorney in Marion, Ohio.

{¶9} On October 28, 2013, the trial court issued a final divorce decree. (Oct. 28, 2013 JE, Doc. No. 77). In its final divorce decree, the trial court divided the marital portion of each party's pension and retirement benefits and the parties' marital and separate debts, denied Michelle's claim on Scott's real estate owned prior to the marriage, and issued a decision on the motions for contempt and

---

[1] The October 28, 2013 judgment entry incorrectly states that the matter was heard on June 24, 2013 and August 5, 2013. (Oct. 28, 2013 JE, Doc. No. 77). The June 28, 2013 transcript incorrectly identifies the hearing as taking place on June 20, 2013. (June 28, 2013 Tr. at 1).

[2] The October 28, 2013 judgment entry incorrectly states that the matter was heard on September 29, 2013. (Oct. 28, 2013 JE, Doc. No. 77). The October 28, 2013 judgment entry also incorrectly states that the trial court heard Scott's contempt motion, filed June 14, 2013, Michelle's contempt motion, filed May 17, 2013, and Michelle's motion for attorney fees filed May 24, 2013, on September 30, 2013, when those matters were litigated at the August 6, 2013 hearing. (*See id.*, Aug. 6, 2013 Tr., and Sept. 30, 2013 Tr.).

motion for attorney fees. (*Id.* at 2). Further, the trial court concluded that the term of Michelle and Scott's marriage was from June 5, 2004 to July 1, 2012. (*Id.*).

{¶10} On November 26, 2013, a purge hearing was held, and the trial court found that Scott failed to purge and ordered Scott to pay a fine of $500.00. (Nov. 27, 2013 JE, Doc. No. 81).

{¶11} Scott filed his notice of appeal of the October 28, 2013 judgment entry and a motion requesting a stay of execution of his sentence on November 27, 2013. (Doc. Nos. 78, 79). The trial court granted Scott's motion requesting a stay of execution of his sentence. (Nov. 27, 2013 JE, Doc. No. 81). Scott raises five assignments of error for our review. We elect to address some of Scott's assignments of error out of the order presented in his brief, combining them where appropriate.

### Assignment of Error No. I

**The family court erred to the prejudice of defendant-appellant by using David Kelley's valuation for purposes of dividing defendant-appellant's STRS by division of property order.**

{¶12} In his first assignment of error, Scott argues that the trial court erred in dividing his State Teacher's Retirement System ("STRS") pension benefits using Kelley's valuation. Specifically, Scott argues that the trial court erred in failing to use the $183,380.05 value recommended by his expert witness, Napoli,

which is based on the Internal Revenue Code ("IRC") method and assumes that Scott will retire at age 65.

{¶13} In determining the equitable distribution of assets in a divorce proceeding, the trial court engages in a two-step process—first, the trial court must determine whether property is marital or separate property, and, second, the trial court must equitably allocate the marital and separate property. *Schalk v. Schalk*, 3d Dist. Seneca No. 13-07-13, 2008-Ohio-829, ¶ 6, citing *Gibson v. Gibson*, 3d Dist. Marion No. 9-07-06, 2007-Ohio-6965, ¶ 29, citing R.C. 3105.171(B), (D). "Pension or retirement benefits accumulated during the course of a marriage are marital assets subject to property division in a divorce action." *Erb v. Erb*, 75 Ohio St.3d 18, 20 (1996), citing *Holcomb v. Holcomb*, 44 Ohio St.3d 128, 132 (1989), *Hoyt v. Hoyt*, 53 Ohio St.3d 177, 178, (1990), and R.C. 3105.171(A)(3)(a)(i).

{¶14} Once the characterization has been made, "the court should normally award each spouse his or her separate property and then distribute the marital estate equally unless an equal division would be inequitable. *Barkley v. Barkley*, 119 Ohio App.3d 155, 159 (4th Dist.1997), citing R.C. 3105.171(C), (D). *See also* R.C. 3105.171(B). The division of a pension or retirement benefit is left to the trial court's broad discretion. *Hoyt* at 180. "The trial court must have the flexibility to make an equitable decision based upon the circumstances of the case,

the status of the parties, the nature, terms and conditions of the pension plan, and the reasonableness of the result." *Id.* The trial court's distribution of pension or retirement benefits will not be disturbed on appeal absent an abuse of discretion. *Id.* at 180-181. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). A reviewing court may not simply substitute its judgment for that of the trial court. *Id.*

{¶15} Scott was employed in the education field throughout the marriage, and Michelle was employed as a healthcare professional throughout the marriage. (Aug. 6, 2013 Tr. at 22-23, 72). As part of Scott's employment in public education, he was entitled to pension benefits under the STRS defined-benefit plan. (June 28, 2013 Tr. at 27). Upon retirement, Michelle anticipated receiving Social Security benefits and income from her Ohio Health cash balance account and her defined-contribution 403(b) plan. (*Id.* at 26).

{¶16} At the final hearing, both parties presented the testimony of expert witnesses regarding the value of their respective pension and retirement benefits. Michelle's expert witness, Kelley, testified that he evaluated Scott's and Michelle's pension and retirement benefits using the Pension Benefit Guaranty Corporation ("PBGC") method, and Scott's expert witness, Napoli, testified that he used the IRC method to create an actuarial present value of their pension and

retirement benefits. (*Id.* at 18, 92). Likewise, Kelley testified that his valuation of Scott's STRS retirement benefits was based on the assumption that Scott would retire at the earliest time available to him, age 55, and Napoli testified that he valued Scott's STRS retirement benefits based on the assumption that Scott would retire at age 65, but also provided the valuation based on retirement at age 55. (*Id.* at 28, 130-131).

{¶17} First, Kelley testified that the PBGC and the IRC methods for pension and retirement benefit evaluations are the two methods that are the most commonly accepted, "[a]nd both are absolutely, positively accepted and used." (*Id.* at 16-17). Moreover, Kelley testified that because both methods are accepted, it is a matter of professional preference as to which method is used to conduct an evaluation. (*Id.* at 17). As such, Kelley testified that he uses the PBGC method because "[i]t is the most objective analysis of how much it would cost for someone to go out and buy replacement annuity in the Annuity Market Place." (*Id.* at 18). Kelley explained, "Every three months, the PBGC commissions a life insurance council to go out and check, I think it's with 25 life insurance companies, exactly how much it would cost amongst different ages and genders to buy a replacement vehicle." (*Id.*). Kelley stated that he uses the PBGC method to give divorce courts an idea of the fair market value of a pension or retirement plan. (*Id.*). Kelley also testified that he does not use the IRC method because it produces

significantly lower values and "was only invented to save pension plans because they were collapsing in the early 2000's." (*Id.* at 19). He stated, "It will always end up with a lower value than is necessary for the nonparticipant spouse to replace that annuity in the annuity market." (*Id.* at 23). As a result, Kelley testified that he uses the PGBC method because it is more reflective of the fair market value. (*Id.* at 24).

**{¶18}** Kelley testified that he valued Michelle's total retirement benefits to be $205,150.28. (*Id.* at 31). In calculating Michelle's total retirement benefits, Kelley testified that he valued Michelle's Ohio Health cash-balance plan at $45,863.01, when using the tracing method, or $18,409.75, when using the coverture method. (*Id.* at 26, 42). Furthermore, Kelley testified that he prefers using the tracing method over the coverture method when evaluating cash-balance plans and that Michelle agreed to use the tracing method even though it benefited Scott more. (*Id.* at 43). Next, Kelley stated that he did not need to evaluate Michelle's 403(b) plan, which had a value of $74,231.24, because "what you see is what you get." (*Id.* at 26). Lastly, he testified that he valued Michelle's Social Security benefits to be $85,056.03 by using the PBGC method, which required him to examine Michelle's earning history through the date of his report and calculate how much she would receive to determine the actuarial present value. (*Id.* at 26-27). Kelley testified that he used the same interest rates to calculate the

value of Michelle's Social Security benefits as he did for Scott's STRS pension. (*Id.*).

{¶19} Kelley testified that he valued the marital portion Scott's STRS retirement plan at $355,761.91 based on an assumption that Scott would retire at age 55. (Aug. 6, 2013 Tr. at 10).[3] Kelley testified that his value was based on eight years of marriage and Scott's 29 years of service at the time of his evaluation. (*Id.* at 8). Kelley testified that he accounted for Scott's prior divorce and the portion of Scott's STRS that was awarded to his previous spouse. (June 28, 2013 Tr. at 40, 70).[4]

{¶20} Kelley testified that he calculated Scott's STRS pension value based on the assumption that he would retire at age 55 because age 55 was the earliest age at which Scott could retire. (*Id.* at 28). Kelley testified that there are a number of assumptions that must be made when calculating an actuarial present value and the most significant assumption is at what age a person will retire. (*Id.* at 52). Kelley testified that he "always uses the earliest age of retirement at – with full benefits or the earlier age if they have a high – if they have a subsidized

---

[3] Kelley initially testified that he valued the marital portion of Scott's STRS pension to be $363,572.29 based on his September 25, 2012 report. (June 28, 2013 Tr. at 27). Kelley determined the marital portion of Scott's STRS pension to be $363,572.29 by applying a coverture fraction to Kelley's overall valuation of Scott's pension, which was $1,277,503.17. (Doc. No. 63). The coverture fraction Kelley used considered 8 years of marriage and 28.11 years of service. (June 28, 2013 Tr. at 27, 29). Due to a change in the Cost of Living Adjustment ("COLA") for STRS, Kelley provided a new valuation of the marital portion of Scott's STRS, which was $355,761.91, taking into consideration the COLA changes. (Aug. 6, 2013 Tr. at 6).

[4] *See Forman v. Forman*, 3d Dist. Marion No. 9-06-63, 2007-Ohio-4938.

benefit" because it is the most logical assumption and STRS offers a subsidized benefit. (*Id.* at 52-53).

**{¶21}** Moreover, Kelley testified that he was concerned with Napoli's valuation of Scott's STRS pension benefits, namely the $131,222.84 valuation, "[b]ecause it's inconsistent with other present values [he has] seen come out of [Napoli's] office." (*Id.* at 60). He stated, "I've seen him do STRS present values, in one case * * * when he projected that the participant would work 15 more years, retire at 52. That inconsistency I found offensive * * *." (*Id.* at 60-61). Further, Kelley stated that he has seen Napoli use different methods "[w]hen he represented the nonparticipant spouse and it would end up with a far higher present value * * *." (*Id.* at 61).

**{¶22}** Unlike Kelley, Scott's expert witness, Napoli, testified that he uses the IRC method because he believes the PBGC method results in lower interest rates and higher present values. (*Id.* at 92). Napoli explained that he disagrees with the PBGC method because of the way the method discards the best interest rates in favor of an average, which he contended is inconsistent with the marketplace. (*Id.* at 93-94). According to Napoli, the IRC method is based on the Corporate Bond Segment Rates published by the Internal Revenue Service, which "are the rates that are required to be used by all qualified plans in the United States to determine the minimum lump sum cash out when a – when an individual either

retires or elects a lump sum or terminates their employment and elects a lump sum." (*Id.* at 92). Further, Napoli stated that he "basically" uses the "High Quality Corporate Bond rate" in conducting his evaluations because it best mimics the marketplace since it solicits bids from at least five insurance companies and then selects the best rate. (*Id.* at 93).

**{¶23}** Next, Napoli testified that a second difference between his evaluation and Kelley's evaluation was the assumption regarding when Scott will retire. (*Id.* at 95). Napoli testified that Kelley assumed Scott would retire at age 55 because it would produce the largest present value and that Kelley's assumption is improper because it detrimentally impacts Scott's liability to Michelle. (*Id.* at 96).

**{¶24}** Napoli testified that he valued Michelle's cash balance account at $46,345.00, her 403(b) plan at $69,179.68, and her Social Security benefits at $43,238.00.[5] (*Id.* at 109-110); (Doc. No. 63). According to Napoli, his valuation of Michelle's Ohio Health cash-balance account and 403(b) plan was fairly close to Kelley's valuation. (*Id.* at 110-111). Napoli testified that his valuation of Michelle's Social Security benefits differed from Kelley's based upon the different application of interest rates under the PBGC and IRC methods and differences in the cost of living calculation. (*Id.* at 112). Napoli testified that he provided three

---

[5] Napoli testified that he prepared an evaluation of Scott's STRS retirement benefits applying the hypothetical Social Security offset in two ways—using Scott's wage history as a government employee and using Michelle's wage history. (*Id.* at 99). However, Napoli acknowledged that the monetary difference in using either hypothetical method was insignificant because he valued Scott's hypothetical Social Security benefits at $45,791.00 and Michelle's hypothetical Social Security benefits at $43,238.00. (*Id.*); (Doc. No. 63).

values of Scott's STRS retirement plan—$131,222.84, under the deferred vested method, $183,380.05, under the sliding coverture method, and $258,993.56, if he assumed Scott would retire at age 55 instead of age 65. (*Id.* at 130-131); (Doc. No. 63). Of the three valuations, Napoli testified that he recommended selecting the value of $131,222.84 as the amount subject to equitable distribution. (Aug. 6, 2013 Tr. at 130); (Doc. No. 63). Specifically, Napoli testified that $131,222.84 was based on the assumption that Scott would stop working with 28 years of service and defer receiving his retirement benefit until age 65. (*Id.* at 135).

{¶25} The trial court concluded that Kelley's method of valuing Scott's and Michelle's pension and retirement benefits to be the most equitable and ordered that Michelle be awarded 20.9 percent of $353,411.91 as her share of the marital portion of Scott's STRS retirement plan.[6] (Oct. 28, 2013 JE, Doc. No. 77). The trial court reasoned that a traditional coverture fraction was inapplicable in this case because the marital value of Scott's STRS pension was offset by the marital value of Michelle's retirement benefits. (*Id.* at 3). The trial court also noted that the parties stipulated that Scott would be given a credit of $2,350.00 toward his pension for his share of Michelle's IRA account and that the value of Scott's pension with the setoff was $353,411.91. (*Id.*); (Doc. No. 47); (Aug. 6, 2013 Tr.

---

[6] The trial court obtained the 20.9 percent figure by combining the marital value of Scott's STRS pension benefits minus the setoff, $353,411.91, and Michelle's total marital retirement benefits, $205,150.28; dividing the sum in half; subtracting Michelle's total retirement benefit from that one-half amount; and putting that amount over Scott's STRS pension value with the setoff (($355,761.91 - $2,350) + $205,150.28 = $558,562.19. $558,562.19 ÷ 2 = $279,281.28. $279,281.28 - $205,150.28 = $74,130.82. $74,130.82 ÷ $353,411.91 = .209). (Oct. 28, 2013 JE, Doc. No. 77). (*See also* Aug 6, 2013 Tr. at 32-33).

at 27). Further, the trial court ordered Scott to obtain a term life insurance policy in the amount of $80,000 to preserve Michelle's survivorship rights in Scott's STRS pension. (*Id.* at 4).

**{¶26}** First, Scott does not dispute the characterization of his and Michelle's pension and retirement benefits accumulated during the course of the marriage, so we will not address it. Second, Scott does not argue that the trial court abused its discretion in allocating his and Michelle's pension and retirement benefits because Kelley and Napoli used the same method in arriving at the end result. (*See* Appellant's Reply Brief at 1). (*See also* Aug. 6, 2013 Tr. at 14). Likewise, Scott does not argue that the valuations presented by Kelley are wrong. (*Id.*). Rather, Scott argues that the trial court erred in using Kelley's valuation instead of Napoli's valuation because Napoli's valuation used different interest rates to determine the value of Scott's pension benefits, and Napoli assumed Scott would retire at a later time than Kelley assumed. (*Id.*).[7]

**{¶27}** We conclude that the trial court did not abuse its discretion in determining that Kelley's valuation of Scott's and Michelle's pension and retirement benefits was the most equitable approach. The trial court heard the testimony of Kelley and Napoli regarding the PBGC and IRC valuation methods

---

[7] Although Napoli testified that the $131,222.84 valuation should be used in the equitable distribution of Scott's and Michelle's pension and retirement benefits, Napoli testified that the $183,380.05 valuation should be used if the court determined that Scott and Michelle's pension and retirement benefits should be divided by a Qualified Domestic Relations Order or other domestic relations order. (June 28, 2013 Tr. at 130); (Doc. No. 63).

used to calculate the present value of Scott's STRS pension benefits. Both witnesses were properly qualified as experts in the field of valuing pension and retirement benefits pursuant to Michelle's and Scott's stipulations. (Aug. 6, 2013 Tr. at 11, 90). Kelley and Napoli acknowledged that the PBGC and IRC methods are acceptable and used for calculating the present value of pension and retirement benefits. (*Id.* at 16-17, 92, 106-107). The fact that Kelley's valuation of Scott's STRS retirement benefits resulted in a larger amount than Napoli's valuation does not amount to an abuse of discretion. Scott provided no evidence or authority that the trial court abused its discretion in determining Kelley's valuation of Scott's and Michelle's pension and retirement benefits other than the blanket statement, "The family court erred in employing the PBGC method rather than the IRC method." (Appellant's Brief at 11). This court cannot simply insert the valuation Scott desires absent a showing of an abuse of discretion, which Scott failed to demonstrate. *See Blakemore*, 5 Ohio St.3d at 219.

{¶28} Similarly, because assumptions, such as the age of retirement, are routinely used to calculate the present value of pension benefits, it does not make them untrustworthy. *See Donnelly v. Donnelly*, 2d Dist. Greene No. 2002-CA-53, 2003-Ohio-1377, ¶ 53, citing *Watkins v. Cleveland Clinic Found.*, 130 Ohio App.3d 262, 271 (8th Dist.1998) and *Catron v. Catron*, 11th Dist. Trumbull No. 96-T-5609, 1997 WL 799507, *2 (Dec. 19, 1997). Scott offered no evidence to

indicate that Kelley's assumption that Scott would retire at age 55 was incorrect. *See Catron* at *6. In fact, the only testimony Scott offered about his retirement plans was that it "[d]epend[ed] on the outcome of this case" and that he met with STRS to discuss "what happened if [he] retired next year, two years, three years, four years, or five years cause [sic] [he] has five years on [his] contract left." (Aug. 6, 2013 Tr. at 36, 212). Conversely, Scott provided no evidence that he would continue working until age 65 or retire and defer his pension until age 65. Thus, the trial court did not abuse its discretion in relying on Kelley's assumption that Scott will retire at age 55. Accordingly, we conclude the trial court did not abuse its discretion in relying on Kelley's valuation of Scott's STRS pension benefits.

{¶29} Therefore, Scott's first assignment of error is overruled.

### Assignment of Error No. II

**The family court erred to the prejudice of defendant-appellant and inequitably distributed property by failing to include credit card debt incurred during the marriage.**

{¶30} In his second assignment of error, Scott argues that the trial court erred in its equitable distribution of assets by failing to include credit-card debt incurred during the marriage. Specifically, Scott argues that credit-card debt associated with his Discover, Citi Diamond, and Visa credit cards should have been considered marital debt and distributed accordingly.

**{¶31}** As noted above, the trial court must first determine whether property is marital or separate property and then equitably distribute the marital and separate property. *Schalk*, 2008-Ohio-829, at ¶ 6. Marital property includes "property that currently is owned by either or both of the spouses * * * and [property] that was acquired by either or both of the spouses during the marriage." R.C. 3105.171(A)(3)(a)(i). The property to be divided in a divorce proceeding includes not only the assets owned by the parties but also any debts incurred by the parties. *Marrero v. Marrero*, 9th Dist. Lorain No. 02CA008057, 2002-Ohio-4862, ¶ 43. Because the statute does not specifically define marital debt, Ohio courts, including this court, have said that marital debt is any debt incurred during the marriage for the joint benefit of the parties or for a valid marital purpose. *See, e.g., Schwarck v. Schwarck*, 3d Dist. Auglaize No. 2-11-24, 2012-Ohio-3902, ¶ 21, citing *Ketchum v. Ketchum*, 7th Dist. No. 2001 CO 60, 2003-Ohio-2559, ¶ 47, citing 1 Brett R. Turner, *Equitable Distribution of Property*, Section 6.29 at 455 (2d Ed.1994, Supp.2002). Similarly, because the statute does "'not specifically articulate debt as an element of marital and separate property, the rules concerning marital assets are usually applied to marital and separate debt as well.'" *Id.*, quoting *Vonderhaar-Kerton v. Kerton*, 5th Dist. Fairfield No. 10 CA 22, 2010-Ohio-6593, ¶ 34.

**{¶32}** Property acquired during a marriage is presumed to be marital property unless it can be shown to be separate. *Barkley*, 119 Ohio App.3d at 160. The party seeking to establish that a debt is separate rather than marital bears the burden of proving, by a preponderance of the evidence, that it was not acquired for the joint benefit of the parties or for a valid marital purpose. *Lucas v. Lucas*, 7th Dist. Noble No. 11NO382, 2011-Ohio-6411, ¶ 33, citing *Vergitz v. Vergitz*, 7th Dist. Jefferson No. 05JE52, 2007-Ohio-1395, ¶ 12 and *Hurte v. Hurte*, 164 Ohio App.3d 446, 2005-Ohio-5967, ¶ 21 (4th Dist.).

**{¶33}** This court reviews a trial court's classification of debt as marital or separate debt under a manifest weight of the evidence standard. *Schalk*, 2008-Ohio-829, at ¶ 6. Accordingly, we will not reverse the trial court's judgment if the decision is supported by some competent, credible evidence. *Eggeman v. Eggeman*, 3d Dist. Auglaize No. 2-04-06, 2004-Ohio-6050, ¶ 14, citing *DeWitt v. DeWitt*, 3d Dist. Marion No. 9-02-42, 2003-Ohio-851, ¶ 10 ("This highly deferential standard of review permits the affirmation of the trial court's judgment if there is 'even some evidence' to support the court's finding."). In determining whether competent, credible evidence exists, "[a] reviewing court should be guided by a presumption that the findings of a trial court are correct, since the trial judge is best able to view the witnesses and observe their demeanor, gestures, and

voice inflections, and use those observations in weighing the credibility of the testimony." *Barkley* at 159, citing *In re Jane Doe I*, 57 Ohio St.3d 135 (1991).

**{¶34}** As we noted above, trial courts generally award each spouse his or her separate property and then distribute the martial property equally, unless an equal distribution would be inequitable. *Id.* Trial courts have "broad discretion to determine what property division is equitable in a divorce proceeding." *Cherry v. Cherry*, 66 Ohio St.2d 348 (1981), paragraph two of the syllabus. A trial court's decision allocating marital property and debt will not be reversed absent an abuse of discretion. *Jackson v. Jackson*, 3d Dist. Paulding No. 11-07-11, 2008-Ohio-1482, ¶ 15, citing *Stump v. Stump*, 3d Dist. Logan No. 8-07-11, 2007-Ohio-6553, ¶ 8 and *Holcomb v. Holcomb*, 44 Ohio St.3d 128, 131 (1989). "The mere fact that a property division is unequal, does not, standing alone, amount to an abuse of discretion." *Cherry* at paragraph two of the syllabus.

**{¶35}** A review of the record indicates that the trial court's determination that a portion of the debt disputed by Scott—namely, $10,500.00 to Prosper, Inc.—was separate debt is supported by some competent, credible evidence. Furthermore, we cannot conclude that the trial court abused its discretion in allocating the Discover, Citi Diamond, and Visa credit-card debt to Scott. A review of the record indicates that the trial court allocated the separate debt to

Scott and considered the equitable interests of both parties in allocating the remaining portion of the credit-card debt to Scott.

{¶36} The credit cards at issue—Discover, Citi Diamond, and Visa—were obtained and maintained in Scott's name only. (Aug. 6, 2013 Tr. at 34, 39, 175). Scott had balances of $10,815.00 on his Citi Diamond card as of October 17, 2011, $4,209.22 on his Discover card as of November 16, 2011, and $2,452.32 on his Visa card as of October 23, 2011. (*See* Doc. No. 63). Michelle testified that, although she maintained credit cards in her name, she did not have any credit-card debt in her name at the time of the separation. (Aug. 6, 2013 Tr. at 83). Scott testified that all of the debts were incurred during the course of his marriage to Michelle. (*Id.* at 236). Likewise, Michelle testified that she assumed Scott had balances on his credit cards at the time they separated because he typically did not pay off his credit cards each month as she did. (*Id.* at 175-176). Michelle further testified that Scott was solely responsible for paying his credit-card bills. (*Id.* at 174-175).

{¶37} Scott testified that he purchased a debt-consolidation and business-venture-counseling program from Prosper, Inc. for $10,500.00 just prior to the time that he and Michelle separated without Michelle's knowledge or consent. (Aug. 6, 2013 Tr. at 35-36). Scott testified that he initially charged the program to his Discover credit card, but later transferred the debt to his Citi

Diamond card to lower his interest rate. (*Id.* at 34-35, 39-40). Scott testified that he transferred the debt from the Discover card to the Citi Diamond card because he "was trying to make it so [he] could be free of any outstanding bills except for the mortgage because Michelle and [he] had always talked about buying a motor home when [they] got older and travel around to all the baseball stadiums in the country and [he] was gonna [sic] try to make – [he] was trying to make it so [he] could be financially well enough to help buy that motor home when [they] got ready to do that." (*Id.* at 233). Scott further testified that he purchased the Prosper, Inc. program for the benefit of the marriage because he thought that he and Michelle were going to work things out. (*Id.* at 234). He stated, "Even after she left, we agreed to see each other twice a week. There was a lot of – there was a lot of communication between the two of us." (*Id.*).

{¶38} Michelle requested that the debt to Prosper, Inc. be considered separate debt. (*Id.* at 85). To establish that the debt should be considered separate debt, Michelle testified that Scott did not tell her about the Prosper, Inc. program, and she did not receive any benefit from it. (*Id.* at 84-85). Michelle testified that the Prosper, Inc. program was purchased approximately two months before she and Scott separated. (*Id.* at 85). She further testified that their marriage was having significant difficulty at the time and that Scott did not discuss the purchase from Prosper, Inc. with her because they engaged in very little communication.

(*Id.* at 85-86). Moreover, Michelle bolstered her testimony that she did not derive any benefit from the debt-education program because the only debt she had at the time was her car loan; therefore, she stated, "[W]hy would I buy a program for ten thousand dollars to tell me how to get out of debt when I only had those like six thousand dollars worth of debt[?]" (*Id.* at 177). As a result, Michelle requested the trial court find the Prosper, Inc. debt to be separate debt and allocate it accordingly. (*Id.* at 176).

{¶39} Further, Scott provided incomplete and conflicting testimony regarding the remaining debt that he claimed. Scott testified that he borrowed $5,000 from a friend and $5,000 from his mother to pay off his car loan and his Discover card. (*Id.* at 38, 43-44, 234).[8] Specifically, Scott testified that he borrowed money from either his mother or a friend to pay off the remaining balance on his Discover card, which was $4,209.22 at the time he and Michelle separated. (*Id.* at 38, 44, 234). Initially, Scott testified that he borrowed money from his mother to pay off his Discover card. (*Id.* at 38). Shortly thereafter, Scott testified that he borrowed money from a friend to pay off his car, but then stated that the money he borrowed from a friend to pay off his car could be considered to have been used to pay off the Discover card. (*Id.* at 43-44). Later, Scott testified that he borrowed money from a friend to pay off his Discover card and borrowed

---

[8] The record reflects that Scott and Michelle stipulated that each party would retain their respective vehicle free and clear of any claim from the other and be responsible for any debt owed on the respective vehicle. (Doc. No. 46).

money from his mother to pay off his car. (*Id.* at 234, 238). Moreover, Scott testified that he did not present proof of the money he claims he borrowed to pay off any of his debts. (*Id.* at 256). Similarly, Michelle testified that any money that Scott borrowed was after she and Scott separated. (*Id.* at 88).

{¶40} When asked what the $4,209.22 on his Discover card was used to purchase, Scott responded that some of the funds were used to purchase the Prosper, Inc. program and other miscellaneous items. (*Id.* at 235). Scott provided this testimony after he testified that he transferred the Prosper, Inc. program purchase to his Citi Diamond card. (*Id.* at 34-35). Scott further stated that some of the miscellaneous items he purchased included college books for his daughter. (*Id.* at 235). Similarly, Scott testified that his Visa card had a balance of $2,458.32, which was attributed to miscellaneous purchases. (*Id.* at 235-236). There is no evidence in the record indicating what the underlying purchases included that resulted in the debt claimed by Scott.

{¶41} The trial court ordered "that each party shall pay their individual debts and shall hold the other party harmless thereon." (Oct. 28, 2013 JE, Doc. No. 77). Specifically, the trial court concluded that Scott's purchase of $10,500.00 from Prosper, Inc. was for Scott's own benefit and not for the benefit of the marriage. (*Id.* at 5). Second, the trial court concluded that Scott did not provide supporting documentation as to what funds were used to pay off the

$4,209.22 on his Discover card and that the trial court found Michelle's explanation more credible. (*Id.*). Third, the trial court concluded that the September 22, 2011 Visa credit-card statement did not reflect a current balance or further transactions. (*Id.* at 6). The trial court further noted that, as stipulated by the parties, each party was responsible for the debt associated with his or her respective vehicle. (*Id.*). The trial court concluded that, because Michelle was not awarded any benefit from any contribution that she paid towards the reduction in Scott's mortgage on their marital house, Scott was responsible for any debt associated with his Discover, Citi Diamond, and Visa credit cards. (*Id.*).

{¶42} There was competent, credible evidence supporting the trial court's conclusion that Michelle satisfied her burden of establishing that the $10,500.00 debt incurred from Prosper, Inc. was not incurred for the joint benefit of the parties or for a valid marital purpose and, thus, separate debt. Michelle testified that she had no knowledge of the program, that she did not benefit from it in any way, and that it was purchased during the point in the marriage when she engaged in very little communication with Scott. Likewise, Scott testified that he purchased the program without Michelle's knowledge or consent. As the trial court is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of the testimony, we hold that the trial court's conclusion that the $10,500.00 debt was

separate property is supported by some competent, credible evidence. *See Barkley*, 119 Ohio App.3d at 159. Furthermore, we conclude that the trial court did not abuse its discretion in allocating the $10,500.00 debt to Scott. *See* R.C. 3105.171(D).

**{¶43}** Moreover, the trial court did not abuse its discretion in allocating the remaining credit card debt to Scott. It appears as though the trial court considered the remaining credit card debt to be marital debt as the trial court considered the equitable interests of the parties in allocating the debt. (Oct. 28, 2013 JE, Doc. No. 77). Michelle requested that she be awarded half the reduction in Scott's mortgage, which amounted to a credit of $3,905.50. (Aug. 6, 2013 Tr. at 75); (Doc. No. 70). The trial court did not award Michelle any credit for the reduction in principal of Scott's mortgage. (Oct. 28, 2013 JE, Doc. No. 77). Noting that it did not award Michelle any credit for the reduction in Scott's mortgage and that each party was responsible for the debt associated with their respective vehicle, the trial court concluded that it was equitable to allocate the remaining portion of the credit-card debt to Scott. (*Id.*). The equitable division of assets does not necessarily mean equal. *Vian v. Vian*, 3d Dist. Mercer No. 10-13-05, 2013-Ohio-4560, ¶ 25, citing *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 95 (1988). *See also Hoffman v. Hoffman*, 10th Dist. Franklin No. 94APF01-48, 1994 WL 424998, *4 (Aug. 11, 1994). (The equitable distribution of assets does not require

-25-

a dollar-for-dollar setoff.). In addition, Scott did not provide any proof of what the remaining amounts on the credit cards were attributed to other than stating miscellaneous items, including, but not limited to, school books for his daughter. Furthermore, Scott provided conflicting testimony regarding the money that he purportedly borrowed to pay off his Discover card and his car loan after he and Michelle separated. Therefore, we conclude that the trial court did not abuse its discretion in allocating the remaining portion of the credit card debt to Scott.

{¶44} As a result, Scott's second assignment of error is overruled.

**Assignment of Error No. III**

**The family court erred to the prejudice of defendant-appellant by finding him in contempt for attempted contact with the plaintiff-appellee.**

**Assignment of Error No. V**

**The family court erred to the prejudice of defendant-appellant by finding him in contempt with respect to the Verizon bill and assessing attorney fees and costs against him.**

{¶45} In his third and fifth assignments of error, Scott argues that the trial court erred in finding him in contempt of court for his attempted contact with Michelle and for failing to abide by the March 4, 2013 stipulation as it pertained to Michelle's Verizon account. Specifically, Scott argues that the trial court did not support with competent, credible evidence its finding, that Scott willfully violated the May 11, 2012 mutual restraining order. Also, Scott argues that, because

stipulations are binding only on the parties, stipulations do not constitute a court order and cannot form the basis for a finding of contempt. As such, Scott argues that there was no competent, credible evidence that he willfully disobeyed the trial court's order because the trial court's April 26, 2013 judgment entry did not specifically impose the April 30, 2013 deadline.

{¶46} A trial court has inherent authority to enforce its prior orders through contempt. *Dozer v. Dozer*, 88 Ohio App.3d 296, 302 (4th Dist.1993). *See also* R.C. 2705.02(A). "A finding of civil contempt requires clear and convincing evidence that the alleged contemnor has failed to comply with the court's prior orders." *Moraine v. Steger Motors, Inc.*, 111 Ohio App.3d 265, 268 (2d Dist.1996), citing *ConTex, Inc. v. Consol. Technologies, Inc.*, 40 Ohio App.3d 94, 95 (1st Dist.1988). "'Clear and convincing evidence' has been defined as 'that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Ohio State Bar Assn. v. Reid*, 85 Ohio St.3d 327, 331 (1999), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "It is not necessary to show willful disobedience for a finding of contempt in cases where it is alleged that a

court order was violated." *Kaufman v. Kaufman*, 3d Dist. Auglaize No. 2-05-24, 2006-Ohio-603, ¶ 15.

**{¶47}** This court will not reverse a finding of contempt absent an abuse of discretion by the trial court. *State ex rel. Ventrone v. Birkel*, 65 Ohio St.2d 10, 11 (1981); *Dozer* at 302. Similarly, an appellate court reviews the punishment imposed for contempt under an abuse-of-discretion standard. *Wilson v. Jones*, 3d Dist. Seneca No. 13-13-06, 2013-Ohio-4368, ¶ 32, citing *Whitman v. Whitman*, 3d Dist. Hancock No. 5-11-20, 2012-Ohio-405, ¶ 52.

**{¶48}** "Factual findings underpinning the trial court's contempt judgment will not be reversed if they are supported by some competent, credible evidence." *Wilson*, at ¶ 12, citing *Sec. Pacific Natl. Bank. v. Roulette*, 24 Ohio St.3d 17, 20 (1986) and *Kerchenfaut v. Kerchenfaut*, 3d Dist. Allen No. 1-03-49, 2004-Ohio-810, ¶ 13. "The trial court is in the best position to judge the credibility of testimony because it is in the best position to observe the witness' gestures and voice inflections." *Id.*, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984) and *Johnson v. Johnson*, 71 Ohio App.3d 713, 718 (11th Dist.1991).

**{¶49}** We agree with Michelle that the trial court did not abuse its discretion in finding Scott in contempt of court for violating the mutual restraining order. The trial court issued a mutual restraining order on May 11, 2012. (Doc. No. 1). The mutual restraining order states, in relevant part:

Pursuant to Local Court Rule 13, it is ORDERED that effective on the date a complaint is filed each spouse is enjoined from committing any of the following acts:

* * *

2. Causing physical abuse, *annoying*, inflicting bodily injury, attempting to cause or recklessly cause bodily injury, threatening the use of force or imminent physical harm, stalking, *harassing*, interfering with or imposing any restraint of the personal liberty of the other spouse, committing any act with respect to a child in violation of the Revised Code of Ohio * * *.

(Emphasis added.) (Doc. No. 1).

{¶50} Scott first attempted to contact Michelle by showing up at her place of employment on December 12, 2012. (Aug. 6, 2013 Tr. at 49). Michelle testified that Scott called her regular work unit and, after being informed by a coworker that she was not at work that day, Scott showed up at another unit at which Michelle worked. (*Id.* at 49-50, 94, 189-190, 245). Michelle testified that, after Scott appeared at the second unit at which Michelle worked, the secretary contacted her to tell her that Scott appeared. (*Id.* at 190). Scott testified that he spoke with Michelle's coworkers about Michelle and brought a "package of stuff and a letter for her." (*Id.* at 50). Scott also attempted to contact Michelle by

showing up at the private residence of a friend of Michelle to inquire about Michelle. (*Id.* at 50, 94, 190-191, 246).

**{¶51}** As a result of Scott's actions, Michelle filed a motion requesting the trial court find Scott in contempt of the court's mutual restraining order. (Doc. No. 39). The trial court concluded that even though Scott was aware that Michelle did not want to reconcile, he appeared, despite the terms of the mutual restraining order, at Michelle's place of employment and a friend's house looking for her, and appeared at Michelle's new residence. (Oct. 28, 2013 JE, Doc. No. 77). As a result of its finding, the trial court awarded Michelle $500.00 in attorney fees. (*Id.* at 11). The trial court noted that Michelle testified that these events "upset and distressed her." (*Id.*).

**{¶52}** While Scott admits that he attempted to contact Michelle, he argues that he was trying to contact Michelle in an attempt to settle the case, and he argues that no competent, credible evidence supports the trial court's finding that he willfully disobeyed the trial court's order. (Aug. 6, 2013 Tr. at 49-50, 245-248).

**{¶53}** Here, it is unnecessary to show that Scott willfully disobeyed the trial court's order as Scott contends. Indeed, a review of the record indicates that competent, credible evidence was presented to clearly and convincingly establish that Scott violated the mutual restraining order by annoying and harassing

-30-

Michelle. Scott admitted that he appeared at Michelle's place of employment, the private residence of a friend of Michelle, and Michelle's parents' house, which was also Michelle's residence for a period of time. (Aug. 6, 2013 Tr. at 49-50, 92, 245-248). Scott further admitted that he was familiar with the mutual restraining order and was aware that Michelle did not want to reconcile. (*Id.* at 49). Michelle testified that Scott's actions that led to her filing the contempt motion were not isolated incidents and that there were other incidents, including Scott "show[ing] up at [her] house, Ashley Drive, knocking on windows, doors." (*Id.* at 95-96). Regarding Scott showing up at her place of employment, Michelle stated, "I've worked there for 25 years and I don't expect my outside personal life to be brought into work like that." (*Id.* at 96). Michelle testified that Scott's actions underpinning the contempt motion upset and bothered her. (*Id.*).

{¶54} "[I]t is important to note that [because] we review a contempt finding under an abuse of discretion standard[, t]his deferential standard is even more warranted in the context of contempt findings arising out of domestic relation proceedings." *Johnson v. Johnson*, 3d Dist. Hancock No. 5-07-34, 2008-Ohio-514, ¶ 31. As a result, we are unwilling to conclude that the trial court abused its discretion in finding Scott in contempt of court for violating the mutual restraining order.

{¶55} Next, we agree with Michelle that the trial court did not abuse its discretion in finding Scott in contempt of court and assessing attorney fees for violating its order with respect to Michelle's Verizon account. Michelle and Scott stipulated, among other things, that "[Michelle] agrees to release [Scott]'s cell pho[ne] no. [sic] so that he may transfer it to his own cell pho[ne] account by April 30, 2013. Both will cooperate in the transfer & [sic] release of cell pho[ne] no. [sic]." (Doc. No. 46). Because of Michelle's concerns about the enforcement of the stipulations, Michelle requested the trial court adopt the stipulations in an order. (Apr. 26, 2013 JE, Doc. No. 50). The trial court ordered, in relevant part: "[Scott] shall take all steps necessary to have his name and his daughter's name removed from the cell phone account(s) listed in [Michelle]'s name held through Verizon/Frontier Communications." (*Id.*). The trial court did not specify a deadline of April 30, 2013. (*Id.*).

{¶56} Michelle testified that the Verizon account was in her name and that she maintained a total of six lines on the account, including Scott and his daughter's. Scott testified that he entered into a stipulation with Michelle to remove his and his daughter's phone lines from Michelle's Verizon account. (Aug. 6, 2013 Tr. at 51). In fact, Scott testified that he that requested to be given until April 30, 2013 to have the phone lines transferred. (*Id.* at 266). Scott testified that Michelle provided him the information Verizon required to transfer

his and his daughter's phone lines and that he initially called Verizon on April 29, 2013 because he knew he had to complete the transfer by April 30, 2013. (*Id.* at 243, 266). However, he stated that he intentionally did not transfer the lines by April 30, 2013 because Verizon informed him that he would incur a fee if he did so before the anniversary date of the account. (*Id.* at 265, 266). Because Scott did not transfer the phone lines by April 30, 2013, Michelle filed a contempt motion on May 17, 2013. (*Id.* at 98); (Doc. No. 52).

**{¶57}** Michelle testified that, after she filed the contempt motion, Scott eventually transferred his phone line but did not transfer his daughter's phone line. (Aug. 6, 2013 Tr. at 98-99). As a result, Michelle continued to pay for Scott's daughter's phone line and eventually incurred a $60.00 fee to have the line disconnected. (*Id.* at 98, 197). Scott concedes that Michelle should be awarded the $60.00 fee. (Appellant's Reply Brief at 9).

**{¶58}** The trial court concluded that Scott did not comply with the parties' stipulation regarding the transfer of the Verizon Account by April 30, 2013 until June 2013, which resulted in a cost of $60.00 to Michelle. (Oct. 28, 2013 JE, Doc. No. 77). As a result of its finding, the trial court awarded Michelle $500.00 in attorney fees. (*Id.* at 8, 11). Scott argues that the trial court abused its discretion by finding him in contempt for failing to comply with a stipulation. Scott also argues that the trial court abused its discretion by finding him in contempt because

he complied with the trial court's order, and because the trial court's order did not impose the April 30, 2013 deadline.

**{¶59}** Here, again, it is unnecessary to establish that Scott willfully disobeyed the trial court's order. A review of the record indicates that competent, credible evidence was presented to clearly and convincingly establish that Scott violated the trial court's April 26, 2013 order. The fact that the trial court noted Scott failed to abide by the parties' stipulations as opposed to its April 26, 2013 order is, at most, harmless error because it would not have changed the outcome of the proceedings. *See Fada v. Information Sys. & Networks Corp.*, 98 Ohio. App.3d 785, 792 (2d. Dist.1994) (errors are not prejudicial where their avoidance would not have changed the result of the proceedings) and Civ.R. 61. The trial court's order regarding Michelle's Verizon account did not include the April 30, 2013 deadline; however, the trial court ordered Scott to "take all steps necessary" to transfer the Verizon account. (Apr. 26, 2013 JE, Doc. No. 50). It is within the trial court's discretion to determine what steps were necessary for Scott to transfer the Verizon account. *See Kerchenfaut*, at ¶ 8, quoting *State ex rel. Bitter v. Missig*, 72 Ohio St.3d 249, 252 (1995) ("[T]he court that issued the order sought to be enforced is in the best position to determine if that order has been disobeyed.").

{¶60} The evidence shows that Scott was aware of the April 30, 2013 deadline established by the parties and that he chose not to comply with it because he thought he might incur a financial detriment and because he thought Michelle should continue to pay for his cell phone since he was paying for her health insurance. (Aug. 6, 2013 Tr. at 54-55, 266). Neither the parties' stipulation nor the April 26, 2013 judgment entry conditions execution of the stipulation or the order on whether either party will suffer a financial detriment. Likewise, even though Scott testified that he told his attorney that he was not going to comply with the April 30, 2013 deadline because Verizon would charge him a fee to transfer the phone lines prior to the anniversary date, no such notice was provided to the court. (*Id.* at 266). Accordingly, as the trial court is in the best position to judge whether Scott complied with its order, we cannot conclude that the trial court abused its discretion in finding Scott in contempt of the trial court's order and assessing attorney fees pertaining to Michelle's Verizon account. *See Kerchenfaut* at ¶ 8. Therefore, it was not an abuse of discretion for the trial court to hold Scott to the April 30, 2013 deadline in light of the parties' stipulation and its order requiring Scott to take all steps necessary to have his and his daughter's phone lines removed from Michelle's Verizon account.

{¶61} For all of these reasons, Scott's third and fifth assignments of error are overruled.

**Assignment of Error No. IV**

**The family court erred to the prejudice of defendant-appellant by failing to sanction plaintiff-appellee for contempt and failing to award him attorney fees associated with his motion.**

{¶62} In his fourth assignment of error, Scott argues that the trial court erred in failing to sanction Michelle and award him attorney fees after finding Michelle in contempt. Specifically, Scott argues that, in its October 28, 2013 judgment entry, the trial court found Michelle in contempt of court for disposing of property—a dog—in violation of the May 11, 2012 restraining order, but failed to sanction Michelle and award Scott attorney fees.

{¶63} As noted above, we review a trial court's finding of contempt for an abuse of discretion. *Birkel*, 65 Ohio St.2d 10 at 11; *Dozer*, 88 Ohio App.3d at 302. A trial court errs as a matter of law and abuses its discretion when it finds a party in contempt, but fails to assess sanctions. *Cichanowicz v. Cichanowicz*, 3d Dist. Crawford No. 3-13-05, 2013-Ohio-5657, ¶ 100.

{¶64} The May 11, 2012 mutual restraining order issued by the trial court, referenced in part above, additionally provided, in relevant part:

Pursuant to Local Court Rule 13, it is ORDERED that effective on

the date a complaint is filed each spouse is enjoined from

committing any of the following acts:

* * *

4. Selling, removing, transferring, encumbering, pledging, hypothecating, damaging, hiding, concealing, assigning or disposing of any and all property, real or personal, owned by both or either spouse or a child (including household goods, vehicles, financial accounts, and the personal property of each) without the prior written consent of the spouse or the Court. Excluded is any account now used for the payment of living costs * * *.

(Doc. No. 1).

{¶65} The parties testified that two dogs were at issue in this case—Mickey and Cain.[9] (Aug. 6, 2013 Tr. at 45, 89). Michelle testified that Mickey was a gift from Scott for her birthday in November 2006. (*Id.* at 89). Further, Michelle testified that the couple adopted Cain from a rescue group two to three years later. (*Id.* at 90). Michelle took both Mickey and Cain in November 2011 when the couple separated. (*Id.* at 46). However, Scott testified that he asked Michelle to leave one dog when she moved out of the house and to switch the dogs back and forth every week. (*Id.* at 47). Scott further testified that he wanted either Mickey or Cain. (*Id.* at 48).[10]

---

[9] Scott had two additional dogs that he kept outside of his house—Stroker and Bullet. One was acquired prior to the marriage and one during the marriage. Neither dog is at issue in this case. (Aug. 6, 2013 Tr. at 47-48).

[10] In his trial brief, Scott requested that he be awarded Mickey and Michelle be awarded Cain. (Doc. No. 63).

**{¶66}** Michelle testified that Cain eventually became destructive because she worked long hours and was not able to provide Cain with the proper care and attention he required. (*Id.* at 93). As such, Michelle testified that, in the Spring of 2013, she found a better home for Cain with "a friend at work * * * [w]ho is home more and can take better care of him." (*Id.*). Michelle testified that she did not communicate with Scott that she needed to rehome Cain. (*Id.* at 179). Michelle testified that she did not communicate with Scott regarding her intention to rehome Cain because Scott never showed any interest in Cain, only Mickey, and that she was afraid to contact Scott regarding any matter because of his past behaviors. (Sept. 30, 2013 Tr. at 8, 11). There is no evidence in the record that Michelle obtained Scott's or the trial court's consent to rehome Cain.

**{¶67}** The trial court found Scott's motion requesting that Michelle be found in contempt for disposing of personal property "to be well taken." (Oct. 28, 2013 JE, Doc. No. 77). The trial court noted that Michelle knew that the "ownership and possession of the parties' two dogs" was in dispute, yet Michelle gave one of the dogs to a third party. (*Id.*). Furthermore, the trial court awarded Scott one of the dogs—Cain. (*Id.* at 9).

**{¶68}** However, it is unclear if the trial court found Michelle in contempt of court for disposing of Cain without Scott's or the trial court's consent. The trial court stated that it found Scott's contempt motion "well taken," but did not

-38-

specifically state that it found Michelle in contempt for violating the mutual restraining order or assess any sanction relative to Scott's contempt motion. In its discussion of attorney fees, the trial court was silent as to whether Scott was awarded attorney fees associated with his August 12, 2013 contempt motion. (*See id.* at 7-8). Moreover, the trial court indicated that Scott's "Motion for Contempt is denied" and that "all other motions not addressed herein are dismissed" in the section of its judgment entry indicating its orders. (*Id.* at 11-12). In denying Scott's "Motion for Contempt" and dismissing "all other motions not addressed herein," it is unclear which of Scott's contempt motions the trial court denied, if the trial court dismissed Scott's August 12, 2013 contempt motion, or if the trial court found Michelle in contempt and failed to sanction her. *See Cichanowicz*, 2013-Ohio-5657, at ¶ 88 (contempt of court consists of two elements—a finding of contempt of court and the imposition of a penalty or sanction), citing *Frey v. Frey*, 197 Ohio App.3d 273, 2011-Ohio-6012, ¶ 17 (3d Dist.) and *Cooper v. Cooper*, 14 Ohio App.3d 327, 328-329 (8th Dist.1984).

{¶69} Accordingly, we sustain Scott's fourth assignment of error as the trial court's judgment regarding Scott's August 12, 2013 contempt motion is unclear. To be a valid order of contempt of court, the trial court must find Michelle in contempt of court for disposing of Cain *and* sanction her accordingly. Or, the trial court must deny or dismiss Scott's contempt motion.

{¶70} Having found no error prejudicial to the appellant herein in the particulars assigned and argued in assignments of error one, two, three, and five, we affirm the judgment of the trial court. Having found error prejudicial to the appellant herein in the particulars assigned and argued in assignment of error four, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**SHAW and ROGERS, J.J., concur.**

**/jlr**